## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>v.<br><br>MARK A. MILLER, SAEID JABERIAN, and CHRISTOPHER J. RAJKARAN,<br><br>　　　　Defendants. | Case No. 21-CV-1445 (DSD/KMM)<br><br>JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC" or "Commission") alleges as follows:

### Nature Of The Action

1.  From July 2017 until at least April 2019, Defendants Mark A. Miller, Saeid Jaberian, and Christopher J. Rajkaran engaged in a fraudulent scheme to target at least seven inactive penny-stock companies (the "Issuers"), by hijacking five of the companies and causing them to issue false and misleading statements, and by falsely promoting the Issuers with the intention of profiting from a "pump and dump" of the stock.

2.  The Defendants' scheme to defraud typically followed the same pattern. First, Defendants Miller, Jaberian, and Rajkaran bought the Issuers' stock on the open market. Miller ultimately purchased over 41 million shares of the Issuers over the course of the scheme at prices ranging from $0.0002 to $0.0069. Jaberian purchased over 289

million shares of the Issuers' stock over the course of the scheme at prices ranging from $0.0001 to $0.0076. Rajkaran purchased over 71 million shares of four of the Issuers over the course of the scheme at prices ranging from $0.0003 to $0.0125.

3.    Next, the Defendants Miller, Jaberian, and Rajkaran reinstated most of the Issuers' state corporate registrations by paying fees and/or filing documents with Secretaries of State for three states that falsely stated that Miller, Jaberian, or Miller's nominee, had become the new President or CEO of the Issuers.

4.    Miller (and Jaberian in one instance) then obtained five of the Issuers' filing codes for the Electronic Data Gathering, Analysis, and Retrieval System ("EDGAR"), a public database operated by the SEC for companies and their agents to file documents required by the federal securities laws, and caused the Issuers to file Forms 8-K, falsely announcing his (or his nominees') new roles in the companies.

5.    Next, the Defendants Miller, Jaberian, and/or Rajkaran would typically draft and issue press releases falsely announcing Miller, Jaberian, or Miller's nominees' appointment to lead the Issuers and the Issuers' upcoming plans. Miller, Rajkaran, or their associates also simultaneously created Twitter accounts for most of the Issuers and posted the false press releases and other false news concerning the Issuers.

6.    The Defendants' aforementioned conduct generated interest in the Issuers and drove higher trading volume and share prices in the Issuers' stock.

7.    Finally, after the pump was over, the Defendants Miller, Jaberian, and Rajkaran dumped the Issuers' stock on unwary investors at prices ranging from $0.0001 to $0.0095, which generated a net profit for all but two Issuers.

8.      By engaging in the transactions, acts, practices, and courses of business alleged herein, the Defendants Miller, Jaberian, and Rajkaran violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, as well as Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a). In addition, Jaberian and Rajkaran knowingly provided substantial assistance to Miller by Jaberian posing as one issuer's CEO, signing and notarizing false forms to gain control of that issuer, and participating in the drafting and issuance of a press release containing material misrepresentations about that issuer, and Rajkaran promoting false information about certain Relevant Issuers on various social media platforms, including Twitter, Facebook, and investorshub.com ("iHUB"), a website popular with individuals who trade in the OTC market, and paying fees to facilitate the scheme. In doing so, Jaberian and Rajkaran aided and abetted Miller's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), and Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b).

## Jurisdiction And Venue

9.      The Commission brings this action pursuant to Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Sections 21(d) and (e) of the Exchange Act, 15 U.S.C. § 78u(d), (e).

10.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27(a) of the Exchange Act, 15 U.S.C.

§ 78aa. The Defendants Miller, Jaberian, and Rajkaran have, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the acts, practices, and courses of business alleged herein.

11.     Venue is proper in this Court pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Acts, practices, and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the District of Minnesota and elsewhere. Moreover, Miller and Jaberian reside or transact business in this district, and Rajkaran currently resides in this district.

## Defendants

12.     **Mark A. Miller**, age 43, is a resident of Pequot Lakes, Minnesota. His last known occupation was in the construction arena, including buying homes, overseeing home improvement projects on the homes, and then buying or renting the properties.

13.     **Saeid Jaberian**, age 59, currently resides in Hopkins, Minnesota. He is self-employed as a real estate broker/agent.

14.     **Christopher J. Rajkaran**, age 35, a resident of Woodhaven, New York. His most recent employment includes operating his own power washing company and day trading.

## Related Entities

15.     The following seven defunct penny-stock companies are the Issuers targeted by the Defendants.

4

16.     **Bebida Beverage Company** ("BBDA") is an inactive Wyoming corporation incorporated in November 2008 with its principal place of business in Mooresville, North Carolina. In January 2017, the State of Wyoming administratively dissolved BBDA. BBDA claims to be in the business of developing, manufacturing, and marketing functional drinks and shots. Prior to a February 25, 2021 trading suspension, BBDA's common stock was quoted and traded on OTC LINK, an electronic inter-dealer quotation system for over-the-counter securities operated by OTC Markets Group Inc. ("OTC Markets").

17.     **Bell Buckle Holdings, Inc.** ("BLLB") was incorporated in Florida in June 2007, with its principal place of business in Aventura, Florida. In September 2009, the Florida Secretary of State listed BLLB's status as administratively dissolved. BLLB claims to be in the business of producing, acquiring and syndicating episodic series designed especially for the Internet. BLLB's common stock is quoted and traded on OTC LINK.

18.     **Digitiliti, Inc.** ("DIGI") was incorporated in Delaware in March 2006, with its principal place of business in St. Paul, Minnesota. In March 2013, DIGI's charter with the State of Delaware became inoperative. DIGI claims to be in the business of developing and delivering superior information management technologies and methodologies enabling their customers to manage, control, protect and access their information and data simply and cost effectively. DIGI's common stock is quoted and traded on OTC LINK.

19.     **Encompass Holdings, Inc.** ("ECMH") was incorporated in Nevada in July

5

1999 under its predecessor's name of Nova Communications Ltd., with its principal place of business in California. In or about 2011, ECMH's status with the State of Nevada was "permanently revoked." ECMH claims to be in the business of developing rotary engines primarily for commercial use. Its common stock is quoted and traded on OTC LINK.

20.    **Simulated Environment Concepts Inc.** ("SMEV") was incorporated in Florida in 1993, with its principal place of business in North Miami Beach, Florida. Its last filing with the State of Florida was in April 2006, and it is listed as inactive. SMEV claims to be in the business of creating innovative, high-quality simulated environment products for medical market, health and beauty market, businesses and consumers. SMEV's common stock is quoted and traded on OTC LINK.

21.    **Strategic Asset Leasing, Incorporated** ("LEAS") was initially incorporated in Wyoming in March 2013 under its predecessor's name, Mammoth Energy Group, Inc. ("Mammoth"), with its principal place of business in New York, New York. In November 2014, Mammoth changed its name to Strategic Asset Leasing, Inc. In May 2017, the State of Wyoming administratively dissolved LEAS. LEAS claims to be in the business of leasing a variety of business equipment ranging from heavy machinery to industrial machinery. LEAS's common stock is quoted and traded on OTC LINK.

22.    **Utilicraft Aerospace Industries, Inc.** ("UITA") was incorporated in Nevada in December 2004, with its principal place of business in Lawrenceville, Georgia. As of March 2018, the State of Nevada listed UITA as inactive. UITA claims to be in the business of developing aerospace products. UITA's common stock is quoted and traded on OTC LINK.

## Facts

23.     Between September 2017 and August 2018, Miller hijacked five of the seven public companies, DIGI, ECMH, BLLB, UITA, and SMEV (the "Hijacked Issuers"). During this time, he also purchased over 31 million shares of the Hijacked Issuers' publicly-traded stock, caused the Hijacked Issuers to issue false and misleading press releases using the internet, promoted the Hijacked Issuers over the internet, and sold four of the five Hijacked Issuers' stock at a net profit.

24.     During this period, Miller recruited Jaberian to help carry out the scheme. Miller initially approached Jaberian and offered to provide him penny stock tips on the Hijacked Issuers in exchange for a share of Jaberian's trading profits, and Jaberian agreed. Miller also recruited Jaberian to participate in the hijacking scheme. Jaberian posed as one of the Hijacked Issuers' CEO, signed and notarized false forms to gain control of one of the Hijacked Issuers, and caused one of the Hijacked Issuers to issue a false and misleading press release using the internet. Between July 2017 and November 2018, Jaberian purchased over 69 million shares of the Hijacked Issuers' publicly-traded stock, and sold three of the five Hijacked Issuers' stock at a net profit.

25.     Miller also recruited Rajkaran to participate in the hijacking scheme. During this period, Rajkaran purchased over 70 million shares of four of the Hijacked Issuers' publicly-traded stock, promoted the Hijacked Issuers over the internet, paid fees to facilitate the scheme, and sold three of the four Hijacked Issuers' stock at a net profit.

### The DIGI Hijacking

26.     As of September 2017, DIGI was a defunct, Delaware entity.

7

27.     On September 29, 2017, through a filing agent (the "Agent"), Miller submitted to the SEC through EDGAR: (a) paperwork falsely identifying himself as President and CEO of DIGI; (b) a forged letter of resignation from DIGI's actual CEO; and (c) a falsified Update Passphrase Confirmation form, requesting DIGI's filing codes.

28.     After hijacking DIGI, Miller caused DIGI to make false and misleading statements in public SEC filings in EDGAR, State of Minnesota corporate filings, and other communications to investors about its purported change in leadership and negotiations for a putative buy-out.

29.     On October 4, 2017, through the Agent, Miller filed with the SEC through EDGAR a DIGI Form 8-K that he had drafted, falsely announcing DIGI's CEO's resignation and Miller's appointment as President and CEO.

30.     On October 11, 2017, Miller filed paperwork with the Secretary of State of Minnesota, falsely identifying himself as a Director of DIGI.

31.     Starting in November 2017, the Defendants began purchasing DIGI stock. On November 10, 2017, Miller bought 50,000 shares of DIGI's stock at a price of $0.0051 per share. From November 10, 2017 through November 28, 2017, Jaberian purchased over 200,000 shares of DIGI stock at prices ranging from $0.0030 to $0.0040. From June 27, 2018 to July 6, 2018, Rajkaran purchased over 800,000 shares of DIGI stock at prices ranging from $0.0045 to $0.0125.

32.     On July 9, 2018, Miller issued a press release that he had drafted, falsely claiming that DIGI had "entered into negotiations with a private corporation regarding the purchase and buy-out of the public entity." The press release further falsely claimed

8

that "[t]he anticipated incoming company has a proven track record of revenue generation and success in a highly desirable market sector."

33.     From approximately October 6, 2017 until February 2019, Miller used a Twitter account with the handle @DigitilitiInc to promote DIGI and repost the Form 8-K and press release.

34.     Miller knew, or was reckless in not knowing, that the EDGAR filings, DIGI Form 8-K, State of Minnesota submission, and DIGI press release that he drafted, and his DIGI-related tweets, contained statements that were materially false and misleading.

35.     First, from before September 2017 through February 2019, Miller was not the President, CEO, or Director of DIGI and, as Miller knew, he had no legitimate relationship with DIGI whatsoever.

36.     Second, from before July 2018 through February 2019, DIGI had not entered into any negotiations for a purchase or buy-out and, as Miller knew, was a defunct Delaware entity.

37.     At the end of July 2018, Miller sold his position in DIGI for $0.006 per share, which resulted in a net profit. In December 2017, Jaberian sold his position in DIGI for $0.003 per share, which resulted in a modest loss. In July 2018, Rajkaran sold his position in DIGI at prices ranging from $0.0047 to $0.0086 per share, which also resulted in a slight loss.

**The ECMH Hijacking**

38.     As of June 2017, ECMH was a Nevada entity with its status "permanently revoked."

39.     Miller, Jaberian, and Rajkaran began purchasing ECMH's stock. From June 2017 through November 2017, Miller purchased 12 million shares of ECMH at prices ranging from $0.0002 to $0.0009. From July 2017 through November 2017, Jaberian purchased over 16 million shares of ECMH at prices ranging from $0.0001 to $0.0012. In November 2017, Rajkaran purchased over 34 million shares of ECMH stock at prices ranging from $0.0004 to $0.0012 per share.

40.     On or about October 20, 2017, Miller drafted a fake resignation letter from the ECMH President and CEO and purported Board of Directors minutes, falsely claiming to have accepted this resignation and falsely appointing himself as President and Board Director.

41.     On November 1, 2017, through the Agent, Miller submitted an Update Passphrase Confirmation form to the SEC through EDGAR, falsely identifying himself as the contact person and CEO of ECMH, and attached the fake Board of Directors minutes he had created.

42.     After Miller hijacked ECMH, Miller caused ECMH to make false and misleading statements in public SEC filings on EDGAR and other communications to investors about its purported change in leadership, shift in focus to real estate, and putative acquisition.

43.     On November 2, 2017, through the Agent, Miller filed with the SEC through EDGAR an ECMH Form 8-K that he had drafted, falsely claiming that the ECMH President and CEO had resigned as of October 20, 2017, and that Miller had been appointed President and sole director of ECMH.

10

44.    On the same date, Rajkaran began falsely promoting ECMH stock on iHUB under the username "Blue Pheonix" [sic]. For example, on November 2, 2017, Blue Pheonix touted ECMH, stating: "ecmh has over 6 to 10 million in real assets as of today." This statement was false.

45.    On November 3, 2017, Miller issued a press release he had drafted, falsely announcing his alleged appointment as ECMH President and "Board of Director." The press release further falsely claimed ECMH was "shifting its focus to Residential and Commercial Real Estate Holdings," and that it "is a publicly traded diversified holding company, which invests in commercial and residential opportunities with the highest possible ROI and cash flow rate to benefit the corporation and its stakeholders."

46.    On November 5, 2017, Miller reached out to ECMH's transfer agent and provided a forged letter of resignation from ECMH's President and CEO and the same false Board of Directors meeting minutes he had attached to the correspondence submitted through EDGAR. Miller advised the transfer agent that he wanted to determine any outstanding balance on the account, as well as a current shareholder list and share structure.

47.    On information and belief, in November 2017, an associate of Miller established a Twitter account for ECMH using the Twitter handle @ecmh44.

48.    From November 2, 2017 until approximately November 5, 2017, this ECMH twitter account posted materially false and misleading news concerning ECMH, including false information concerning Miller's appointment as CEO and references to the November 3, 2017 press release. Several of these tweets were signed "Mark."

49.     On November 8, 2017, Rajkaran (using the username "Blue Pheonix") made a series of posts on iHUB designed to promote and inflate the price of ECMH stock. For example, he posted that the new CEO was "probably worth close to 20 million in real estate holding[s] and construction equipment . . . heard he owns several strip malls in mn." These statements were false.

50.     On November 9, 2017, Miller drafted and issued another false press release concerning ECMH. This time, the press release falsely stated that, two days earlier, ECMH had entered into an agreement with DDG Properties and assumed holdings worth approximately $6.4 million. The press release further falsely stated that ECMH would assume DDG's gross revenues of $534,000.

51.     On November 9, 2017, seven days after Miller had caused ECMH to file the false November 2, 2017 Form 8-K, Miller reached out to ECMH's true President and CEO via email, expressing his desire "to open a dialogue between [them] about [Miller] assuming control of ECMH." Miller went on to state, "[w]e have the capacity and the resources to bring this company back to life; which includes NV SoS [sic] back to Active, and all filings that are currently in Arrears. . . . . I would appreciate you and I working out some type of arrangement for you to exit the company."

52.     In November, Miller, Jaberian, and Rajkaran sold all of their ECMH stock. Specifically, on November 9, 2017, Miller sold all of his ECMH shares at prices ranging from $0.0011 to $0.0012, which resulted in a net profit. From November 6, 2017 through November 10, 2017, Jaberian sold all of his ECMH shares at prices ranging from $0.0006 to $0.0013, which resulted in a net profit. From November 10, 2017 through November

14, 2017, Rajkaran sold all of his ECMH shares at prices ranging from $0.0011 to $0.0021, which resulted in a net profit.

53.     In a series of emails dated November 10, 2017 through December 13, 2017, ECMH's President and CEO confronted Miller about Miller's fraud and false statements concerning ECMH.

54.     On November 14, 2017, through the Agent, Miller filed with the SEC through EDGAR an ECMH Form 8-K that he had drafted, falsely stating that Miller had resigned and that the true ECMH President and CEO had been reappointed as President, CEO, and Sole Board Member of ECMH.

55.     Miller knew, or was reckless in not knowing, that the EDGAR submissions, ECMH Forms 8-K, ECMH press releases that Miller drafted, and the ECMH-related tweets contained statements that were materially false and misleading.

56.     First, from before November 1, 2017 through November 14, 2017, Miller knew, or was reckless in not knowing, that ECMH's President and CEO had not resigned, or been reappointed, and Miller was neither the President nor sole director of ECMH. In fact, as Miller knew, Miller had no legitimate relationship with ECMH whatsoever.

57.     Second, before November 3, 2017, Miller knew, or was reckless in not knowing, that ECMH was not shifting its focus to residential and commercial real estate and was, in fact, a company with permanently revoked status and no current business operations.

58.     Third, before November 9, 2017, Miller knew, or was reckless in not knowing, that ECMH had not entered into an agreement with DDG Properties, a

company that Miller started to buy rental properties.

59.     Rajkaran knew, or was reckless in not knowing, that the false ECMH posts Rajkaran wrote and put on iHUB contained statements that were materially false and misleading.

60.     From before November 2, 2017 through November 8, 2017, Rajkaran knew, or was reckless in not knowing, that ECMH did not have over $6 to $10 million in real assets and that ECMH's CEO was not worth close to $20 million and did not own several Minnesota strip malls.

**The BLLB Hijacking**

61.     As of February 2018, BLLB was an administratively dissolved company in the State of Florida.

62.     To conceal his involvement with BLLB, in or about February 2018, Miller asked Jaberian to serve as his nominee for the false BLLB filings Miller intended to make. Jaberian agreed.

63.     On or about February 20, 2018, Miller drafted fake board minutes that falsely purported to accept the resignation of the President and CEO of BLLB and to appoint Jaberian as the new President and CEO.

64.     Starting on February 22, 2018, Miller, Jaberian, and Rajkaran began purchasing BLLB stock. Specifically, on February 22, 2018, Miller purchased 8 million shares of BLLB stock at prices ranging from $0.0002 to $0.0003. From February 23, 2018 through February 28, 2018, Jaberian purchased 20.5 million shares of BLLB stock at prices ranging from $0.0008 to $0.0046. From February 22, 2018 to February 26,

2018, Rajkaran purchased over 35 million shares of BLLB stock at prices ranging from $0.0003 to $0.0013.

65.     On February 22, 2018, the same date that Miller acquired BLLB stock, Miller filed BLLB's reinstatement paperwork with the Secretary of State of Florida, falsely identifying Jaberian as BLLB's CEO and registered agent. Rajkaran paid the $2,108.75 in fees to reinstate the company with the Florida Secretary of State.

66.     On or about February 23, 2018, Jaberian completed, signed, and notarized an Update Passphrase Confirmation form on behalf of BLLB, identifying himself as the CEO.

67.     On February 23, 2018, through the Agent, Miller and Jaberian submitted to the SEC through EDGAR this Update Passphrase Confirmation form, falsely identifying Jaberian as CEO of BLLB, along with the reinstatement paperwork that Miller had previously filed with the State of Florida.

68.     After hijacking BLLB, Miller and Jaberian caused BLLB to make false and misleading statements in public SEC and State of Florida filings and other communications to investors about its supposed change in leadership.

69.     On February 26, 2018, through the Agent, Miller and Jaberian filed with the SEC through EDGAR a BLLB Form 8-K that Miller had drafted, falsely stating that the BLLB CEO and Board member had resigned and that Jaberian had been appointed as CEO and sole Director. The Form 8-K was signed by Jaberian as "President, Secretary, CEO and sole director." The BLLB Form 8-K also contained false information Jaberian had provided about Jaberian's background and experience, falsely stating that Jaberian

had "been in the import/export business for the last 35 years, primarily dealing in bulk leather sales through the ports of Salerno, Italy and Izmir, Turkey; with commercial real estate ties to Dubai."

70.     On February 26, 2018, Miller and Jaberian drafted and issued a press release to a third-party newsletter service that contained false information about Jaberian's background and the industry. The draft press release repeated the false information from the Form 8-K and falsely claimed that Jaberian's appointment was "a coordinated change of ownership between both parties." The draft press release also contained quotes from Jaberian falsely claiming that BLLB was "expanding into the United States Import/Export Market," his family-owned business had $7.1 million in gross international revenue in 2017, and that he anticipated a 10 to 20 percent increase in growth in 2018 after taking over BLLB. None of this was true. Miller, Jaberian, and Rajkaran were aware that the false press release was sent for publishing and did not stop the press release from being publicly disseminated.

71.     The final version of the press release was published on February 28, 2018. In lieu of mentioning the gross revenue of his family-owned business and the anticipated growth rate, the final press release misrepresented that BLLB operated in a "$500 million dollar a year industry." Rajkaran paid the fee to publish the false press release.

72.     On information and belief, in February 2018, an associate of Miller established a Twitter account for BLLB using the Twitter handle @AJaberian_BLLB.

73.     From approximately February 28, 2018 until July 12, 2018, BLLB's Twitter account posted false information concerning BLLB's financial condition, among

16

other things.

74.     Miller, Jaberian, and Rajkaran knew, or were reckless in not knowing, that the State of Florida and EDGAR submissions, BBLB Form 8-K, BLLB press release, BLLB-related iHUB postings, and BLLB-related tweets contained statements that were materially false and misleading.

75.     First, before February 22, 2018 through February 28, 2018, Miller, Jaberian, and Rajkaran knew, or were reckless in not knowing, that the BLLB CEO and Board member had not resigned.

76.     Second, before February 22, 2018 through February 28, 2018, Miller, Jaberian, and Rajkaran knew, or were reckless in not knowing, that Jaberian was neither the CEO nor the sole Director of BLLB, Jaberian did not have a legitimate relationship with BLLB, and Jaberian's listed background and experience was false.

77.     Starting on February 27, 2018 and continuing through March 1, 2018, Miller sold his BLLB position at prices ranging from $0.0016 to $0.0053, which resulted in a net profit. Between February 27, 2018 and March 1, 2018, Jaberian sold his position in BLLB at prices ranging from $0.0018 to $0.0050, which resulted in a net profit. From February 28, 2018 to March 1, 2018, Rajkaran sold his position in BLLB at prices ranging from $0.0013 to $0.0045, which resulted in a net profit.

**The UITA Hijacking**

78.     As of March 2018, UITA was a defunct State of Nevada company.

79.     In March 2018, Miller, Jaberian, and Rajkaran purchased UITA stock. From March 8, 2018 through March 14, 2018, Miller purchased 2.55 million shares of

UITA at prices ranging from $0.0003 to $0.0069. From March 9, 2018 through March 21, 2018, Jaberian purchased over 5 million shares of UITA at prices ranging from $0.0010 to $0.0076. From March 15, 2018 to March 19, 2018, Rajkaran purchased over 250,000 shares of UITA at $0.0070 per share.

80.     On March 13, 2018, Miller filed a certificate of reinstatement for UITA in the Secretary of State of Nevada and paid UITA's outstanding fees. He also submitted additional paperwork falsely identifying his brother as UITA's President and Director ("UITA Nominee 1"), another brother as UITA's Treasurer ("UITA Nominee 2"), and himself as UITA's Secretary.

81.     After hijacking UITA, Miller caused UITA to make false and misleading statements in public SEC and State of Nevada filings and other communications to investors about its supposed change in leadership and alleged business plans.

82.     On or about March 15, 2018, Miller created a "Resignation and Appointment" document that Miller forged with the purported signature of UITA's then-CEO, and that falsely stated the company was accepting the CEO's resignation, the resignation of all other corporate officers, and was appointing UITA Nominee 1 and UITA Nominee 2 as officers of UITA.

83.     That same day, Rajkaran began promoting UITA stock through a series of posts on iHUB.

84.     On or about March 16, 2018, through the Agent, Miller submitted to the SEC through EDGAR an Update Passphrase Confirmation form, falsely identifying UITA Nominee 1 as CEO of UITA. Miller attached the fake "Resignation and

18

Appointment" document to this submission. The SEC processed this submission on March 20, 2018.

85.     On March 21, 2018, through the Agent, Miller filed with the SEC through EDGAR a UITA Form 8-K that he drafted, falsely stating that, effective March 15, 2018, the Board of Directors had accepted the CEO's resignation and appointed UITA Nominee 1 as the new President, CEO, and Chairman of the Board and UITA Nominee 2 as the Treasurer and a Board member, and Miller as UITA Interim Secretary and Advisor.

86.     On March 22, 2018, Miller issued a UITA press release, falsely announcing the change in UITA ownership and the company's alleged plans to enter into a new market sector.

87.     Miller knew, or was reckless in not knowing, that the State of Nevada and EDGAR submissions, UITA Form 8-K that he had drafted, and the press release were materially false and misleading.

88.     Before March 13, 2018 through March 21, 2018, Miller knew, or was reckless in not knowing, that the true UITA CEO had not resigned, and neither UITA Nominee 1, UITA Nominee 2, nor Miller had officer or director positions at UITA. Further, before March 22, 2018, Miller also knew, or was reckless in not knowing, that the UITA ownership information was false and UITA had no plans to enter into a new market sector.

89.     In March and April 2018, Miller, Jaberian, and Rajkaran sold their UITA stock. On March 22 and 23, 2018, Miller sold his UITA position at prices ranging from $0.0032 to $0.0053, which resulted in a net profit. On March 21 and 22, 2018, Jaberian

sold his UITA position at prices ranging from $0.0050 to $0.0095, which resulted in a net profit. Between March 21 and April 3, 2018, Rajkaran sold his UITA position at prices ranging from $0.0050 to $0.0095, which resulted in a net profit.

**The SMEV Hijacking**

90.     As of August 2018, SMEV was an inactive State of Florida company.

91.     In the summer of 2018, Miller and Jaberian bought shares of SMEV stock. On August 16 and 17, 2018, Miller bought over 9 million shares of SMEV stock at prices ranging from $0.0002 to $0.0004. From July 20 through August 29, 2018, Jaberian bought over 27 million shares of SMEV stock at prices ranging from $0.0001 to $0.0004.

92.     On August 20, 2018, Miller paid the fees to register SMEV with the Secretary of State of Florida, and the next day, on August 21, 2018, he filed an Article of Incorporation falsely identifying another individual as the registered agent, incorporator, and initial officer and/or director ("SMEV Nominee").

93.     On August 22, 2018, through the Agent, Miller submitted to the SEC through EDGAR an Update Passphrase Confirmation, falsely identifying SMEV Nominee as the CEO of SMEV.

94.     After hijacking SMEV, Miller caused SMEV to make false and misleading statements in public SEC filings and other communications to investors about its supposed change in leadership and alleged business plans.

95.     On August 24, 2018, through the Agent, Miller filed with the SEC through EDGAR a SMEV Form 8-K that he had drafted, falsely claiming that, effective July 18, 2018, SMEV's corporate officers had resigned and the SMEV Nominee was appointed as

the President, CEO, Secretary and sole director.

96.    On information and belief, in or about August 2018, an associate of Miller established a Twitter account for SMEV using the Twitter handle @simenvirocon.

97.    From approximately mid-August 2018 until September 6, 2018, the SMEV Twitter page referenced the false Form 8-K and stated additional filings and updates would be coming.

98.    Miller knew, or was reckless in not knowing, that the State of Florida and EDGAR submissions, SMEV Form 8-K that he drafted, and SMEV-related tweets were materially false and misleading.

99.    Before August 20, 2018 through September 6, 2018, Miller knew, or was reckless in not knowing, that the true SMEV officers had not resigned, the SMEV Nominee was not the President, CEO, Secretary or sole director and, in fact, the SMEV Nominee had no legitimate relationship with SMEV.

100.   From August 27, 2018 through November 14, 2018, Jaberian sold his position in SMEV at prices ranging from $0.0001 to $0.0006, which resulted in a net loss. On December 3, 2018, Miller sold his position in SMEV at $0.0001 per share, which resulted in a net loss.

**Miller Uses Social Media to Pump and Dump the Stock of Two Other Issuers.**

101.   Between at least February 2019 and March 2019, Miller provided consulting services to two public companies, LEAS and BBDA (the "Pumped Companies"), purchased over 9 million shares of the Pumped Companies' publicly-traded stock, falsely promoted the Pumped Companies over the internet, and sold the

Pumped Companies' stock at a net profit.

**Miller Falsely Promoted LEAS.**

102.    In February 2019, Miller began his consulting role with LEAS, an administratively dissolved State of Wyoming company.

103.    Between February 12 and 15, 2019, Miller bought 2.775 million shares of LEAS stock, at prices ranging from $0.0003 to $0.0013.

104.    Miller paid the fees to reinstate LEAS with the Secretary of State of Wyoming and, on February 13, 2019, filed the reinstatement documents. Those documents indicated that a LEAS associate was now acting as the sole officer and director of LEAS.

105.    On or around February 12, 2019, Miller created a LEAS Twitter account with the handle @StrategicLease. The LEAS Twitter account, which Miller operated from February 12, 2019 until approximately May 2019, provided corporate updates about LEAS reverse merger prospects that were false (the "LEAS tweets").

106.    On information and belief, Miller obtained information for the LEAS tweets from two LEAS associates, but Miller did nothing to confirm the accuracy or truthfulness of the information, resulting in Miller disseminating false and misleading information about LEAS to the public.

107.    On February 27 and March 1, 2019, Miller tweeted from the LEAS Twitter account about a potential merger with an "Asset Management Firm," and claimed that "'[t]he incoming business has $50 Million in assets and $10 Million in annual revenues.'"

108.    On March 8, 2019, Miller tweeted from the LEAS Twitter: "We would like

to provide some insight for shareholders – It is true that our phone number is the same as that of Bebida Beverage Company per their registration. The same entity controls both shells, and both are RM candidates. Thanks, IR. $LEAS $BBDA."

109.   Miller knew, or was reckless in not knowing, when he made the LEAS tweets that these tweets were materially false and misleading. From before Miller tweeted on February 27, 2019 through March 8, 2019, Miller knew, or was reckless in not knowing, that LEAS was not in merger talks with an asset management firm, the value of the assets and revenues was false, and the same entity did not control both of the LEAS and BBDA shells.

110.   Miller's LEAS tweets also attempted to lend legitimacy to the company but the tweets contained false information or omitted to state material facts necessary to make the tweets not misleading under the circumstances.

111.   For example, on March 11, 2019, Miller tweeted from the LEAS account that LEAS had "reached out to FINRA to go through a voluntary interview and verification process to put an immediate stop to all of the false claims and lies being spread," and that LEAS would "be interviewing and working with [a named] FINRA Senior Investigator." On April 11, 2019, Miller further tweeted from the LEAS account that "FINRA's main concern was whether or not shares were issued to be sold into the retail market. The answer was NO!"

112.   Miller knew, or was reckless in not knowing, that these tweets were materially false or omitted to state material facts necessary to make the tweets not misleading under the circumstances. From before Miller tweeted on March 11, 2019

through April 11, 2019, Miller knew, or was reckless in not knowing, that the named FINRA Senior Investigator was from FINRA's Office of Fraud Detection and Market Intelligence, material information that Miller omitted making the tweet false and misleading under the circumstances. Further, because FINRA interviewed Miller before April 11, 2019, Miller knew, or was reckless in not knowing, that FINRA's primary areas of inquiry concerned LEAS's reinstatement, change in control, and certain tweets concerning LEAS's operations, and not the sale of retail shares as Miller indicated.

113.   Between March 8 and 18, 2019, Miller published, on behalf of LEAS, four different versions of the annual report for the period ending December 31, 2018 on OTC Markets ("LEAS December 31, 2018 Annual Report"), one on March 8 ("March 8, 2019 Filing"), two on March 11 ("March 11, 2019 Filing 1") and ("March 11, 2019 Filing 2"), and the final one on March 18, 2019 ("March 18, 2019 Filing"), that each were materially false and misleading. Between March 8 and March 26, 2019, Miller used the LEAS Twitter account to provide information concerning the LEAS December 31, 2018 Annual Report.

114.   First, in the March 8, 2019 Filing and the March 11, 2019 Filing 1 versions of the LEAS December 31, 2018 Annual Report that Miller drafted and filed, LEAS falsely reported that it was not a shell company and its current operations included "equipment leasing."

115.   Miller knew, or was reckless in not knowing, that this statement in both filings was materially false and misleading since LEAS had no operations and was a shell at the time he made the filings.

116.    By at least February 27, 2019, before Miller filed the first LEAS annual report in the March 8, 2019 Filing, Miller knew, or was reckless in not knowing, that LEAS was in talks about acquiring a company, but the deal had not yet been finalized.

117.    Indeed, in the March 11, 2019 Filing 2, Miller revised the annual report to state LEAS had "no operations," but stated LEAS was not a shell company. After questions from OTC Markets, Miller amended the LEAS December 30, 2018 Annual Report again to reflect LEAS had a shell status and made the March 18, 2019 Filing.

118.    Second, in the March 8, 2019 and both the March 11, 2019 Filing 1 and Filing 2, LEAS falsely reported that it had issued shares throughout fiscal years 2016 and 2017, but no additional shares had been issued in 2018.

119.    Miller knew, or was reckless in not knowing, that these statements were materially misleading because the annual reports omitted to state material facts that would have informed investors that approximately 103 million shares were in transition between owners at the time of each filing.

120.    Miller was in communication with the LEAS transfer agent since at least February 7, 2019, and had brought the account current as of February 15, 2019, with full access to information concerning its shareholders and structure. Miller also had submitted share activity information to OTC Markets prior to filing the different versions of the December 31, 2018 Annual Report.

121.    Accordingly, before Miller filed the March 8, 2019 Filing, the March 11, 2019 Filing 1 and the March 11, 2019 Filing 2, Miller knew, or was reckless in not knowing, that the share activity information in each version of the December, 31 2018

Annual Report was inaccurate and misleading.

122.    In the March 18, 2019 Filing, Miller amended the LEAS December 31, 2018 Annual Report to disclose that 102,321,015 shares of restricted LEAS common stock and 1,000,000 preferred C series LEAS shares were in transition between owners.

123.    Between February 21 and 26, 2019, Miller sold his position in LEAS at prices ranging from $0.0012 to $0.0032, which resulted in a net profit.

**Miller Falsely Promoted BBDA.**

124.    In March 2019, Miller began his consulting role with BBDA, an administratively dissolved State of Wyoming company.

125.    On March 4, 2019, Miller acquired 7 million shares of BBDA stock at a price of $0.0002 per share.

126.    Miller paid the fees to reinstate BBDA with the Secretary of State of Wyoming and, on March 7, 2019, filed documents identifying BBDA's President and Director and stating that the previous officer had been permanently removed from BBDA pursuant to a voluntary resignation on September 30, 2018.

127.    On or around March 7, 2019, Miller created a BBDA Twitter account with the handle @BebidaBevCo, which he operated from March 7, 2019 until approximately March 19, 2019, posting updates concerning the company.

128.    On March 8, 2019, Miller tweeted from the BBDA account that the BBDA President and Director was the only acting principal at the time. On the same day, Miller also retweeted from the BBDA account the LEAS tweet that falsely stated that the same entity controlled both LEAS and BBDA.

129.   Miller knew, or was reckless in not knowing, that these tweets were materially false and misleading. Before Miller made the March 8, 2019 tweets, he knew, or was reckless in not knowing, that the BBDA President and Director was not the only acting principal since, as Miller knew, another BBDA associate was the majority shareholder and had a controlling interest in BBDA. Further, before Miller made the March 8, 2019 tweet, he knew, or was reckless in not knowing, that the BBDA and LEAS shells were not controlled by the same entity.

130.   Starting on March 6, 2019 and continuing through March 8, 2018, Miller sold his position in BBDA at prices ranging from $0.0010 to $0.0015, which resulted in a net profit.

**Miller and Jaberian Enter into an Investment Partnership Agreement.**

131.   In or around July 2017, Miller and Jaberian entered into an agreement, whereby Jaberian agreed to provide Miller with 50 percent of any profits Jaberian made on the sale of stocks that Miller told Jaberian to buy.

132.   Miller and Jaberian formalized this agreement in or around March 2019.

133.   Miller informed Jaberian of his consulting role with LEAS and BBDA and suggested that Jaberian purchase LEAS and BBDA stock.

134.   Jaberian then purchased and subsequently sold LEAS and BBDA stock, generating a net profit.

135.   Jaberian made payments of at least $78,000 to Miller pursuant to the profit-sharing agreement. These profits were derived from Jaberian's sale of LEAS and BBDA stock.

**The Defendants Reap Ill-Gotten Gains.**

136.    As a result of the aforementioned conduct, Miller, Jaberian, and Rajkaran reaped more than $45,000, $240,000, and $65,000, respectively, in trading profits. Jaberian shared at least $78,000 with Miller pursuant to their profit-sharing agreement, for a total of more than $100,000 in trading profits for Miller.

137.    These proceeds represent the Defendants' ill-gotten gains from the securities fraud scheme described above.

## Claims For Relief

## COUNT I

### *Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder*
**(Against All Defendants)**

138.    The Commission realleges and incorporates by reference paragraphs 1 through 137 as if fully set forth herein.

139.    By virtue of the conduct alleged herein, Defendants Miller, Jaberian, and Rajkaran, directly or indirectly, singly and in concert with others, by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly and recklessly, has: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and has omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchases of

28

securities or upon other persons.

140.    In engaging in the conduct described herein, Defendants Miller, Jaberian, and Rajkaran acted knowingly and with a reckless disregard for the truth.

141.    By reason of the foregoing, Defendants Miller, Jaberian, and Rajkaran, directly or indirectly, violated and, unless enjoined, will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## COUNT II

### *Violations of Section 17(a) of the Securities Act*
### (Against All Defendants)

142.    The Commission realleges and incorporates by reference paragraphs 1 through 137 as if fully set forth herein.

143.    By virtue of the conduct alleged herein, Defendants Miller, Jaberian, and Rajkaran, directly and indirectly, singly and in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails: (a) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud; (b) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

144.    In engaging in the conduct described herein, Defendants Miller, Jaberian,

and Rajkaran acted knowingly, with a reckless disregard for the truth, and negligently.

145.   By reason of the foregoing, Defendants Miller, Jaberian, and Rajkaran violated, and unless enjoined will likely again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## COUNT III

### *Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder* **(Against Defendants Jaberian and Rajkaran)**

146.   The Commission realleges and incorporates by reference paragraphs 1 through 137 as if fully set forth herein.

147.   Defendant Miller, directly or indirectly, singly and in concert with others, by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly and recklessly, has: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and has omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchases of securities or upon other persons.

148.   Defendants Jaberian and Rajkaran knowingly or recklessly provided substantial assistance to Defendant Miller in the commission of these violations.

149.   By reason of the foregoing, Defendants Jaberian and Rajkaran are liable pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), for aiding and abetting

Defendant Miller's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and unless enjoined, Defendants Jaberian and Rajkaran will again aid and abet those violations.

## COUNT IV

### *Aiding and Abetting Violations of Section 17(a) of the Securities Act*
### **(Against Defendants Jaberian and Rajkaran)**

150.    The Commission realleges and incorporates by reference paragraphs 1 through 137 as if fully set forth herein.

151.    Defendant Miller, directly and indirectly, singly and in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails: (a) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud; (b) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

152.    Defendants Jaberian and Rajkaran knowingly or recklessly provided substantial assistance to Defendant Miller in the commission of these violations.

153.    By reason of the foregoing, Defendants Jaberian and Rajkaran are liable pursuant to Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), for aiding and

abetting Defendant Miller's violations of Section 17(a) of the Securities Act, 15 U.S.C.

§ 77q(a), and unless enjoined, Defendants Jaberian and Rajkaran will again aid and abet

those violations.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### (Injunctive Relief Against Future Securities Law Violations)

Enter an Order of Permanent Injunction, in a form consistent with Rule 65(d) of

the Federal Rules of Civil Procedure, restraining and enjoining the Defendants from

violating or aiding and abetting violations of Section 10(b) of the Exchange Act, 15

U.S.C. § 78j, and Rule 10b-5, 17 C.F.R. § 240.10b-5 thereunder, and Section 17(a) of the

Securities Act, 15 U.S.C. § 77o(a);

### II.

### (Disgorgement of Ill-Gotten Gains)

The Commission seeks a final judgment ordering the Defendants to disgorge the

ill-gotten gains they received with prejudgment interest thereon pursuant to Sections

21(d)(5) and 21(d)(7) of the Exchange Act, 15 U.S.C. § 78u(d)(5), (d)(7);

### III.

### (Civil Penalties)

Enter an Order requiring the Defendants to pay civil penalties pursuant to Section

20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act,

15 U.S.C. § 78u(d)(3);

## IV.

### (Officer and Director Bar)

Enter an Order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), permanently prohibiting the Defendants from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act;

## V.

### (Penny Stock Bar)

Entering an Order, pursuant to Section 21(d)(6)(A) of the Exchange Act, 15 U.S.C. § 78u(d)(6)(A), prohibiting the Defendants from participating in an offering of penny stock;

## VI.

### (Retention of Equitable Jurisdiction)

Retain jurisdiction over this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

## VII.

### (Other Relief)

Grant such other relief as the Court deems appropriate.

# JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury on all issues so triable.

November 1, 2021                    Respectfully submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

 /s/  Alyssa A. Qualls
Alyssa A. Qualls (IL No. 6292124)
Amy S. Cotter (IL No. 6238157)
Raven A. Winters (IL No. 6291077)
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
(312) 353-7390
(312) 353-7398 (FAX)
quallsa@sec.gov
cottera@sec.gov
wintersr@sec.gov

*Attorneys for Plaintiff United States Securities and Exchange Commission*

Craig R. Baune
Assistant U.S. Attorney
Attorney ID No. 331727
United States Attorney's Office
  for the District of Minnesota
600 United States Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Phone: 612-664-5600
Craig.baune@usdoj.gov

*Local Counsel*