UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**MARK A. MILLER, SAEID JABERIAN, and CHRISTOPHER J. RAJKARAN,**<br><br>Defendants. | Case No. 21-CV-01445 (DSD/ECW) |

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR REMEDIES AND
FINAL JUDGMENT AGAINST DEFENDANT MARK A. MILLER**

Plaintiff United States Securities and Exchange Commission ("SEC"), pursuant to the agreed framework for determining financial remedies previously entered by the Court (Dkt. No. 99, § V), in support of its Motion for Remedies and Final Judgment against Defendant Mark Miller, states:

**PROCEDURAL HISTORY**

On June 18, 2021, the SEC filed the Complaint in this matter, alleging that Defendant Mark Miller ("Miller") violated the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") by engaging in an illegal "pump and dump" of publicly traded stocks. (Dkt. No. 1.) On November 1, 2021, the SEC filed the Amended Complaint naming Saeid Jaberian ("Jaberian") and Christopher

Rajkaran ("Rajkaran) as additional defendants for their role in the same scheme. (Dkt. No. 20.)

According to the SEC's Amended Complaint,[1] beginning in 2017, Miller, Jaberian, and Rajkaran (collectively, "Defendants") participated in, and profited from, a fraudulent scheme to acquire control of five inactive penny-stock companies (the "Hijacked Issuers"). Pursuant to that scheme, Defendants purchased millions of shares of the Hijacked Issuers' stock on the public market; filed documents with state regulators stating that Miller or others were the CEO or president of the Hijacked Issuers; issued false public information about the Issuers through official press releases, public filings, and social media posts, with the intent of boosting the Hijacked Issuers' stock price; and then profited by selling the shares of the Hijacked Issuers they owned at higher prices. The scheme defrauded thousands of retail investors who purchased shares of the Hijacked Issuers at inflated prices. (*See* Dkt. No. 20, ¶¶ 1-7.)

On June 18, 2021, the United States Attorney for the District of Minnesota unsealed a three-count indictment against Miller, Jaberian, and Rajkaran, charging each with securities fraud, wire fraud, and conspiracy to commit securities fraud – based on the same conduct alleged in the SEC's Amended Complaint concerning four of the five Hijacked Issuers (DIGI, ECHM, BLLB, and UITA). *See United States v. Miller, Rajkaran, and Jaberian,* Case No. 0:21-cr-00142-DSD-ECW (D. Minn.) (Dkt. No. 1, ¶¶ 2-43.) On October 14, 2021, Miller pleaded guilty to conspiracy to commit securities

---

[1] The SEC amended its Complaint on November 1, 2021. (Dkt. No. 20.)

fraud (Count One) for his role in hijacking and falsely promoting BLLB, DIGI, ECMH, and UITA. (*Id.*, Dkt. Nos. 85, 206, 238.) The Court sentenced him to 12 months and one day in prison followed by a two-year term of supervised release and ordered him to forfeit $38,292. (*Id.*, Dkt. Nos. 210, 212, 218, 226, 229, 249.) Miller has completed his prison term and has paid the forfeiture money judgment ordered by the Court.

The Court stayed this case on November 16, 2021, pending conclusion of the parallel criminal case. (Dkt. No. 29.) On December 1, 2023, after the conclusion of the criminal case, the Court entered an order setting a discovery schedule and a trial date. (Dkt. No. 53.) Miller answered the SEC's Amended Complaint on June 10, 2024. (Dkt. No. 82.)

Thereafter, Miller agreed to a bifurcated process for resolving the SEC's claims against him. Miller consented to the entry of a judgment which, among other things: (1) subjected him to an order of permanent injunctive relief which prohibited him engaging in future violations of the securities laws, and (2) barred him from (i) serving as an officer or director of a public company and (ii) participating in any penny stock offering. (Dkt. Nos. 95-96.) On September 30, 2024, the Court entered a partial judgment against Miller to adopt the terms of this agreement. (Dkt. No. 99.) In that judgment, the SEC agreed to withdraw its request for a civil penalty against Miller in light of Miller's sentence of imprisonment in the parallel criminal case. (*Id.* § V.) The bifurcated agreement left for this Court to determine, upon motion of the SEC, the amount of disgorgement and prejudgment interest Miller must pay. In connection with the SEC's motion for financial relief, Miller also agreed that: (a) the Court should accept as true all

3

of the SEC's factual allegations in the Amended Complaint; and (b) Miller would be precluded from arguing that he did not violate the federal securities laws as alleged in the Amended Complaint. (Dkt. Nos. 96, Ex. 1 ¶ 4; 99 § V.)

The SEC has now determined that, over the course of his fraud, Miller obtained a total of at least $126,007 in ill-gotten gains, plus prejudgment interest of $9,536, offset by the $38,292 he paid pursuant to his order of criminal forfeiture, for a total of $97,251. (*See* Declaration of Kathleen Sweeney ("Sweeney Decl.") ¶ 14.) The SEC therefore respectfully requests that this Court enter a Final Judgment that orders Miller to disgorge the net amount of these ill-gotten gains, plus prejudgment interest.

## ARGUMENT

**I. The Facts Alleged in the Amended Complaint, and Accepted as True for this Motion, Demonstrate Miller Committed Securities Fraud.**

The SEC alleged Miller violated Sections 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act. For the purposes of this Motion, Miller has agreed that all facts alleged in the SEC's Amended Complaint are deemed true. (Dkt. Nos. 96-1 ¶ 4; 99 § V.) *See also SEC v. Juno Mother Earth Asset Mgmt., LLC*, No. 11 CIV. 01778, 2014 WL 1325912, at *3 (S.D.N.Y. Mar. 31, 2014) ("When a defendant enters a consent judgment with the Commission and agrees not to challenge the details of the Commission's complaint, courts accept the allegations in the complaint to be true when deciding the Commission's subsequent motion for monetary relief."). Miller also has agreed not to contest any of the SEC's claims for liability under the securities laws as alleged in the Amended Complaint. Based on the deemed-true

4

facts, the Court should find that Miller is liable for each of the securities law violations alleged by the SEC.

### A. Miller Violated Exchange Act Section 10(b) and Rule 10b-5(a) and (c) and Securities Act Sections 17(a)(1) and (a)(3).

Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c) thereunder, prohibit any person from employing "any device, scheme, or artifice to defraud" or engaging in any "act, practice, or course of business" which operates as a fraud or deceit upon any person, in connection with the purchase or sale of a security. 15 U.S.C. §§ 78j(a) and (c) and 17 C.F.R. §§ 240.10b-5(a) and (c). Sections 17(a)(1) and (a)(3) of the Securities Act prohibit any person from, in the offer or sale of a security, employing "any device, scheme, or artifice to defraud" or engaging in any "transaction, practice, or course of business" which operates as a fraud or deceit. 15 U.S.C. §§ 77q(a)(1) and (3). Proof of *scienter* is required to establish violations of Rules 10b-5(a) and (c) and Section 17(a)(1), but not for Section 17(a)(3), where negligence is sufficient. *See Aaron v. SEC*, 446 U.S. 680, 691, 696-97 (1980).

The language of each of these provisions is "expansive" and they "capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 79 (2019). The Supreme Court has held that knowingly disseminating a false statement to investors with the intent to deceive can violate Rules 10b-5(a) and (c), and Section 17(a)(1), even if the defendant is not a "maker" of the statement for purposes of Rule 10b-5(b).[2] *Id.* The Court has emphasized

---

[2] *See Janus Capital Group, Inc. v. First Derivative Traders,* 564 U.S. 135, 142 (2011) (holding that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or

that there is "considerable overlap among the subsections of" Rule 10b-5 and Section 17(a), and thus the same underlying conduct may establish a violation of more than one subsection. *Id.* at 80. *See also Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983) ("it is hardly a novel proposition that" different portions of the securities laws "prohibit some of the same conduct"). The Supreme Court's holding in *Lorenzo* also extends to the interpretation of Section 17(a)(3). *See Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019).

The language in Section 17(a) regarding in the "offer" or "sale" is expansive enough to encompass the entire selling process. *See United States v. Naftalin*, 441 U.S. 768, 773 (1979). Likewise, Section 10(b)'s "in connection with" language is broadly construed and typically met if "the scheme to defraud and the sale of securities coincide." *SEC v. Zandford*, 535 U.S. 813, 822 (2002); *SEC v. Markusen*, No. 14-cv-3395 (MJD/TNL), 2016 WL 1629267, at *9 (D. Minn. Apr. 25, 2016). For example, the "in connection with" requirement has been deemed satisfied by filing a registration statement containing false and misleading statements, *SEC v. Carriba Air, Inc.*, 516 F. Supp. 120, 122 (N.D. Ga. 1980), *aff'd*, 681 F.2d 1318 (11th Cir. 1982), as well as by material omissions in press releases and SEC filings, *SEC v. Joseph Schlitz Brewing Co.*, 452 F. Supp. 824, 829 (E.D. Wis. 1978).

Within the Eighth Circuit, "[t]he element of scienter requires proof of intent to deceive, manipulate, or defraud." *SEC v. Shanahan*, 646 F.3d 536, 543 (8th Cir. 2011)

---

entity with ultimate authority over the statement, including its content and whether and how to communicate it").

(citation omitted). *Scienter* may be based on "severe recklessness," which is shown by "highly unreasonable omissions or misinterpretations that involve . . . an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* (quoting *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 654 (8th Cir. 2001)). Negligence means a "'fail[ure] to use the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise in the situation.'" *SEC v. Quan*, No. 11-cv-723 ADM/JSM, 2013 WL 5566252, at *8 (D. Minn. Oct. 8, 2013) (quoting *SEC v. True North Fin. Corp.*, 909 F. Supp. 2d 1073, 1122 (D. Minn. 2012)).

Here, Miller violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder and Sections 17(a)(1) and (3) of the Securities Act. Between September 2017 and August 2018, Miller gained control of the Hijacked Issuers (public companies DIGI, ECMH, BLLB, UITA, and SMEV), purchased over 31 million shares of the Hijacked Issuers' publicly traded stock, caused the Hijacked Issuers to issue false and misleading press releases, promoted the purchase of the Hijacked Issuers stock over the internet, and sold four of the five Hijacked Issuers' stock at a net profit. (Dkt. No. 20, ¶ 23.) Miller recruited Rajkaran and Jaberian to participate in the hijacking scheme. (*Id.* ¶¶ 24-25.) Between November 2017 and March 2019, Miller profited more than $48,000 from his trading in (i) the Hijacked Issuers' shares and (ii) the shares of LEAS and BBDA (collectively, the "Pumped Companies"), which Miller falsely promoted on social media. (*Id.* ¶ 136; *see also* Sweeney Decl. ¶ 6 and Ex. A.) In addition, Miller received at

7

least $78,000 in trading profits from Jaberian's sales of LEAS and BBDA stock pumped by this misinformation.[3] (Dkt. No. 20 ¶¶ 101, 135; *see also* Sweeney Decl. ¶¶ 7-10 and Exs. B-C.)

Miller was the architect and leader of this scheme to control five defunct public companies and pump the price and volume of the Hijacked Issuers' securities by making misrepresentations in public filings. Miller, through a filing agent, submitted false paperwork to obtain four of the five Hijacked Issuers' filing codes for Electronic Data Gathering, Analysis, and Retrieval System ("EDGAR"), a public database operated by the SEC for companies and their agents to file documents required by the federal securities laws. (*Id.* ¶¶ 27, 40-41, 84, 93.) In this paperwork, Miller falsely announced that he was the new President and CEO of DIGI and ECMH, his brothers were officers and a director of UITA, and another nominee was the CEO of SMEV (whereas Jaberian falsely claimed to be the CEO of BLLB). (*Id.* ¶¶ 27, 30, 40, 65, 67, 80, 82, 92-93.) Through the agent, Miller then filed with the SEC through EDGAR false Forms 8-K for Hijacked Issuers, falsely announcing new management and other false information. (*Id.* ¶¶ 29, 43, 51, 69, 85, 95.) Miller also drafted and issued false press releases about the

---

[3] MJ Builders of MN, LLC ("MJ Builders"), a Minnesota company of which Miller is the CEO, and Pars Investment Inc. ("Pars Investment"), a Minnesota company of which Jaberian is the CEO, entered into a Profit Sharing Agreement, whereby Pars Investment agreed to provide MJ Builders with 50 percent of any profits Pars Investment made on the sale of stocks that Miller recommended. Jaberian and/or Pars Investment invested in the Pumped Companies based on information provided by Miller and generated a net profit upon the sale of the shares. Jaberian and/or Pars Investment then paid MJ Builders at least $78,000 pursuant to their agreement. Miller deposited these checks into a bank account that he controlled. (Dkt. No. 20, ¶¶ 131-135; *see also* Sweeney Decl. ¶¶ 7-10 and Exs. B-C.)

Hijacked Issuers. (*Id*. ¶¶ 32, 45, 50. 70. 86.) Miller spread false information about DIGI using social media and paid the corporation fees to reinstate UITA and SMEV with the Secretaries of State of Nevada and Florida, respectively. (*Id*. ¶¶ 33, 80, 92.) With respect to the Pumped Companies, Miller spread false information on Twitter (*id*. ¶¶ 105-112, 127-129), and published materially false and misleading annual reports (*id*. ¶¶ 113-122).

Miller profited from these schemes when he sold shares of the Hijacked Issuers and Pumped Companies, usually at inflated prices, and received 50 percent of Jaberian's profits on the Pumped Companies. (*Id*. ¶¶ 37, 52, 77, 89, 100, 123, 130, 135.) Miller also bought and sold shares of the Hijacked Issuers and Pumped Companies in the open market (*id*. ¶¶ 16-22, 31, 37, 39, 52, 64, 77, 89, 91, 100, 103, 123, 125, 130), which satisfies the requirements of "in the offer or sale" of securities under Section 17(a) of the Securities Act, and "in connection with" the purchase or sale of securities under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

Further, Miller acted with the intent to deceive, or was at a minimum severely reckless. Miller knew that the DIGI, ECMH, BLLB, UITA, and SMEV Forms 8-K and press releases were false, or he acted in a highly unreasonable manner by failing to confirm the truth of the information he shared. (Dkt. No. 20, ¶¶ 29, 32-36, 43, 45, 50, 54-58, 69-71, 74-76, 85-88.) For example, Miller knew, or was reckless in not knowing, that the true President and CEO of ECMH, a "permanently defunct" Nevada corporation, had not resigned, or been reappointed, and that Miller was neither its President nor sole Director and had no legitimate relationship with ECMH whatsoever. (*Id*. ¶¶ 19, 56.) Similarly, Miller knew the LEAS and BBDA tweets and LEAS annual reports were false,

9

or he acted recklessly in not ascertaining the truth of the information before he shared it with the market. (*Id*. ¶¶ 109-112, 113-122, 128-129.)

### B. Miller Violated Exchange Act Section 10(b) and Rule 10b-5(b) and Securities Act Section 17(a)(2).

Section 10(b) of the Exchange Act and Rule 10b-5(b) prohibit any person from "making any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," in connection with the purchase or sale of a security. Section 17(a)(2) of the Securities Act prohibits obtaining money or property by means of a misstatement or omission in the offer or sale of a security.

A misstated or omitted fact is material when a substantial likelihood exists that a reasonable investor would have viewed the fact "as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). *See also SEC v. Save the World Air, Inc.*, No. 01-cv-11586-(GBD)FM, 2005 WL 3077514, at *10-11 (S.D.N.Y. Nov. 15, 2005) (misrepresentations regarding a company's business dealings are material); *SEC v. North Am. Research & Dev't Corp.*, 375 F. Supp. 465, 470-71 (S.D.N.Y. 1974), *aff'd*, 511 F.2d 1217 (2d Cir. 1975) (misrepresentations regarding business operations and plans were material). Liability for misstatements under Securities Act Section 17(a)(2) requires a showing of negligence, while liability under Rule 10b-5(b) requires *scienter*. *Aaron*, 446 U.S. at 691, 696-97.

Miller violated Section 17(a)(2) of the Securities Act and Section 10(b) of the

Exchange Act and Rule 10b-5(b) thereunder when he made false statements to the public as part of the scheme. Miller made numerous false statements about the Hijacked Issuers and Pumped Companies. For example, Miller filed with the SEC, through the filing agent and EDGAR, false Forms 8-K for Hijacked Issuers, falsely announcing new management and other false information, and drafted and issued false press releases about the Hijacked Issuers. (Dkt. No. 20, ¶¶ 29, 32-36, 43, 45, 50-51, 55-58, 69-71, 74-76, 85-88, 95, 98-99.) Further, Miller falsely promoted DIGI, LEAS, and BBDA on Twitter. (*Id*. ¶¶ 33-36, 105-109, 111-112, 113-122.)

Miller obtained both money and property as a result of these statements by selling shares of Hijacked Companies and Pumped Companies at a higher price than otherwise would have been possible if he had not made the false statements. (*Id*. ¶¶ 37, 52, 77, 89, 100, 123, 130, 135.) A reasonable investor would find it important to an investment decision to know that the statements Miller disseminated about the Hijacked Issuers and Pumped Companies were false. *See Basic*, 485 U.S. at 231-32. Miller's conduct enabled him to sell his shares in the Hijacked Issuers and Pumped Companies into the open market, fraudulently and at a profit, to the detriment of uninformed retail investors.

**II.     Miller Should Disgorge His Ill-Gotten Gains with Prejudgment Interest.**

Section 21(d) of the Exchange Act authorizes courts to order disgorgement "of any unjust enrichment by the person who received such unjust enrichment as a result of such violation" in any Commission enforcement action. 15 U.S.C. §§ 78u(d)(3)(A), 78u(d)(7). Courts also have the authority to order a defendant to pay prejudgment interest on ill-

11

gotten gains. *See Markusen*, 143 F. Supp. 3d at 893. Disgorgement "need be only a reasonable approximation of profits causally connected to the violation." *Id*.

The SEC is entitled to an order of disgorgement and prejudgment interest from Miller. He took repeated and active steps to perpetrate the fraudulent scheme and is liable under the securities laws. Accordingly, Miller should not be permitted to retain any of the financial benefits he obtained as the result of his actions.

The SEC respectfully requests that Miller be ordered to pay disgorgement in the amount of $126,007, offset by the $38,292 he was ordered to forfeit in the parallel criminal action. This request is consistent with the Supreme Court's decision in *Liu v. SEC*, 591 U.S. 71 (2020), as it best approximates Miller's net profits from its violations. This disgorgement amount represents Miller's total profits or gains from the fraudulent scheme, including amounts Jaberian paid to Miller pursuant to the Profit Sharing Agreement. (*See* Sweeney Decl., ¶¶ 6-11 and Exs. A-C.) Because Miller's scheme (a) to take over the Hijacked Issuers, pump up the price of their shares through false and misleading statements, and then dump the stock by selling at a gain before the stock price declined, and (b) to use social media to pump and dump the stock of the Pumped Companies was a complete fraud, Miller should forfeit all of his trading profits, and there are no legitimate business expenses to deduct against those gains.

In addition, Miller should also be ordered to pay prejudgment interest of $9,536. The prejudgment interest figure was calculated on a quarterly basis, using the same rate that the IRS applies to the underpayment of taxes, beginning at the end of the month in which Miller sold the last security for which he realized a gain, as alleged in the SEC's

12

complaint. (*See id*. ¶¶ 12-13 and Ex. D.)

Accordingly, the SEC respectfully requests that the Court enter an order requiring Miller to pay $126,007 in disgorgement, plus prejudgment interest of $9,536, less the $38,292 that he was ordered to forfeit in the parallel criminal action, for a total of $97,251.[4] (*Id*. ¶ 14.)

## **CONCLUSION**

For all of the foregoing reasons, Plaintiff SEC respectfully requests that the Court enter a Final Judgment against Defendant Mark A. Miller, in the form provided, and pay disgorgement in the amount of $97,251.

Dated: December 23, 2024    */s/ Alyssa A. Qualls*
Alyssa A. Qualls (QuallsA@sec.gov)
Robert M. Moye (MoyeR@sec.gov)
U.S. Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
Phone: (312) 353-7390
*Attorneys for the Plaintiff United States Securities and Exchange Commission*

---

[4] In light of Miller's term of incarceration ordered in the criminal case, the SEC already has agreed to forgo the claim for a civil penalty against Miller.

# CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2024, I served the Plaintiff's Memorandum of Law in Support of Its Motion for Remedies and Final Judgment against Defendant Mark A. Miller upon the following individuals as indicated below:

**Mark A. Miller**

Robert A. Lengeling
310 Fourth Ave S, Suite 1050
Minneapolis, Minnesota 55415
(612) 963-1555
rob@beitolengelinglaw.com
**Via ECF**

*Attorney for Defendant Miller*

**SAEID JABERIAN**
Minneapolis, Minnesota 55305
perspolisjon1@gmail.com
(612) 251-2727
**Via Email**

*Pro Se*

**Christopher J. Rajkaran**
Cooperstown, New York 13326
chris6x8@gmail.com
**Via Email**

*Pro Se*

  */s/ Alyssa A. Qualls*
Alyssa A. Qualls