# EXHIBIT 4

```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA

---------------------------------------------------------------
                                    )
 United States of America,          ) File No. 21-CR-142(3)
                                    ) (DSD/ECW)
         Plaintiff,                 )
                                    )
 vs.                                ) Minneapolis, Minnesota
                                    ) November 28, 2022
 Saeid Jaberian, also known as      ) 9:59 a.m.
 Andre Jaberian,                    ) Courtroom 14W
                                    )
         Defendant.                 )
---------------------------------------------------------------
```

**BEFORE THE HONORABLE DAVID S. DOTY**
**UNITED STATES DISTRICT COURT JUDGE**
**(CHANGE OF PLEA HEARING)**

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | Assistant United State Attorney<br>JOSEPH THOMPSON<br>300 South Fourth Street<br>Suite 600<br>Minneapolis, Minnesota 55415 |
| For the Defendant: | Mauzy Law Office<br>WILLIAM J. MAUZY, ESQ.<br>650 Third Aveue South<br>Suite 260<br>Minneapolis, MN 55402 |
| Court Reporter: | MARIA V. WEINBECK, RMR-FCRR<br>1005 U.S. Courthouse<br>300 South Fourth Street<br>Minneapolis, Minnesota 55415 |

   Proceedings reported by court reporter; transcript produced by computer.

1    Q.  And the way we do that is what's called a factual basis,
2    and we have that in the plea agreement here; is that right?
3    A.  Yes, sir.
4    Q.  And what happens, this is starting on page 2 of the plea
5    agreement.  There's a summary of the crime that you
6    committed, okay?
7    A.  Yes, sir.
8    Q.  Have you had an opportunity to review that with your
9    lawyer?
10   A.  Yes, sir.
11   Q.  Is it true and accurate?
12   A.  Yes, sir.
13   Q.  I'm going to go through it here today and then we'll see
14   if Judge Doty is satisfied, okay?
15   A.  Okay.
16   Q.  Mr. Jaberian, in February of 2018, you participated in a
17   pump and dump scheme; is that right?
18   A.  Yes, sir.
19   Q.  And that was involving a company called Bell Buckle
20   Holdings; is that right?
21   A.  Yes, sir.
22   Q.  Bell Buckle Holdings was a dormant public shell company
23   that traded over the counter; is that right?
24   A.  Yes, sir.
25   Q.  And it traded under the symbol BLLB; is that right?

1     A. Correct.
2     Q. As part of the scheme, you and your co-conspirators
3     bought stock in Bell Buckle Holdings at low prices in the
4     over-the-counter stock market; is that right?
5     A. Yes, sir.
6     Q. And you were able to obtain millions of shares of Bell
7     Buckle Holding stock; is that right?
8     A. Yes, sir.
9     Q. That was because the stock traded at only a fraction of
10    a penny per share?
11    A. Yes, sir.
12    Q. So for a relatively small cost, you were able to obtain
13    millions of shares?
14    A. Yes, sir.
15    Q. After buying -- and your co-conspirators, they bought
16    stuff as well; is that right?
17    A. Yes, sir.
18    Q. After buying stock in Bell Buckle Holdings, your
19    co-conspirators hijacked and took control of the company?
20    A. Yes, sir.
21    Q. They did so by creating and filing fake resignation
22    letters and board minutes purporting to announce the
23    resignation of the prior corporate officers of the company;
24    is that right?
25    A. Yes, sir.

1  Q.  Those fake resignation letters and board minutes also
2  purported to announce that you had been appointed as the new
3  president and CEO of Bell Buckle Holdings; is that right?
4  A.  Yes, sir.
5  Q.  That wasn't true, was it?
6  A.  No, sir.
7  Q.  Okay.  After those letters and board minutes were
8  prepared purporting to announce your appointment as the
9  president and CEO of the company, you then submitted a
10  request for access to Bell Buckle Holdings account with the
11  Security and Exchange Commission's electronic data gathering
12  analysis and retrieval system; is that right?
13  A.  Yes, sir.
14  Q.  That's the EDGAR system; is that right?
15  A.  Yes, sir.
16  Q.  And that's the system that allows publicly traded
17  companies to make public filings to potential investors and
18  current investors in the company; is that right?
19  A.  Yes, sir.
20  Q.  After you submitted the request for access to the Bell
21  Buckle Holdings EDGAR account, it allowed you and your
22  co-conspirators to make public filings on behalf of the
23  company; is that right?
24  A.  Yes, sir.
25  Q.  Mr. Jaberian, you then provided information used to

1   draft a press release announcing your appointment as the CEO
2   of Bell Buckle Holdings; is that right?
3   A.   Yes, sir.
4   Q.   This press release was later edited by your
5   co-conspirators; is that right?
6   A.   Yes, sir.
7   Q.   And it contained false statements about your background;
8   is that right?
9   A.   Yes, sir.
10  Q.   It also contained false statements claiming that you
11  intended to run Bell Buckle Holdings as an import/export
12  business involved in bulk leather sales; is that right?
13  A.   Yes, sir.
14  Q.   That wasn't true?
15  A.   No, sir.
16  Q.   Okay.  Your conspirators used the press release or
17  issued the press release to fraudulently inflate or pump up
18  the price of Bell Buckle Holdings stock; is that right?
19  A.   Yes, sir.
20  Q.   Mr. Jaberian, you didn't -- weren't aware of all the
21  details; isn't that fair to say?
22  A.   No.
23  Q.   But you were aware that your co-conspirators were?  Or
24  you kind of turned a blind eye to your co-conspirators'
25  nefarious acts; is that fair to say?

1    A.   Yes, sir.
2    Q.   You also benefited from it, took advantage of their
3    actions; is that right?
4    A.   Yes, sir.
5    Q.   By selling your Bell Buckle Holdings stock at
6    fraudulently inflated prices?
7    A.   Yes, sir.
8    Q.   In other words, after they issued those fraudulent press
9    releases, the stock price jumped up?
10   A.   Uh-huh.
11   Q.   And that was the intent of their releases?
12   A.   Yes, sir.
13   Q.   And then you sold those inflated prices at a profit; is
14   that right?
15   A.   Yes.
16   Q.   In all, you made a profit of approximately $67,034 from
17   your stock sales during that pump-up portion of the scheme;
18   is that right?
19   A.   Yes, sir.
20   Q.   You later lost about $10,000 in those profits through
21   additional sales of buying and selling Bell Buckle Holdings
22   stock; is that right?
23   A.   Yes, sir.
24   Q.   All right.  Mr. Jaberian, that's obviously not
25   everything that happened but that's a summary of what you

1  did; is that right?
2  A.  Yes, sir.
3  Q.  I want to ask you, Mr. Jaberian, why are you pleading
4  guilty today?
5  A.  Well, I did something wrong, so I'm here to admit it and
6  take responsibility.
7           MR. THOMPSON:  Thank you very much.
8           Nothing further, Your Honor.
9           THE COURT:  Okay, Mr. Thompson.
10          Mr. Mauzy, do you have any questions or comments
11 you would like to put on the record at this point?
12          MR. MAUZY:  I do not, Your Honor.
13 BY THE COURT:
14 Q.  Mr. Jaberian, I do.  I'll have some questions for you.
15 A.  Yes, sir.
16 Q.  They're similar sometimes and maybe even the same
17 questions, but I have my own reasons for asking.
18          Number one, the first question I always ask
19 someone in your position is whether you are here voluntarily
20 to plead guilty?
21 A.  Yes, sir.
22 Q.  And in that sense, have you had anybody threaten,
23 coerce, do anything to force you to come here today to plead
24 guilty?
25 A.  No, sir.