# EXHIBIT 6

## Page 1

```
            UNITED STATES DISTRICT COURT
               DISTRICT OF MINNESOTA

UNITED STATES SECURITIES     )
AND EXCHANGE COMMISSION,     )
                             )
         Plaintiff,    ) Case No.
                       ) 21-CV-01445(DSD/ECW)
     v.                )
                       )
MARK A. MILLER, SAEID        )
JABERIAN, and CHRISTOPHER    )
J. RAJKARAN,                 )
                             )
         Defendants.   )
_____)


              VIDEOTAPED DEPOSITION OF
                   SAEID JABERIAN
              Friday, September 20, 2024
                Minneapolis, Minnesota




Reported by:
Deanna Oaks, RPR
JOB No. 240920ARMN
```

## Page 2

```
APPEARANCES:
FOR THE PLAINTIFF:
   UNITED STATES SECURITIES AND EXCHANGE
   COMMISSION
   175 West Jackson Boulevard
   Suite 1450
   Chicago, Illinois 60604
   Phone:  312.353.7390
   Email:  quallsa@sec.gov
   By:  Alyssa A. Qualls
        Robert M. Moye


PRO SE DEFENDANT:

   12601 Ridgemount Avenue West
   Minnetonka, Minnesota 55305
   Phone:  612.251.2727
   Email:  perspolisjon1@gmail.com
   By:  Saeid Jaberian
        Defendant

ALSO PRESENT:

   VIDEOGRAPHER
   Robert Buchman
```

## Page 3

```
                I N D E X
WITNESS: SAEID JABERIAN
    Examination by Alyssa A. Qualls:    6
    Witness's Certificate:            245
    Witness errata:                   246
    Reporter's Certificate:           247
                E X H I B I T S
EXHIBIT      DESCRIPTION            PAGE
Exhibit 1    Indictment               25
Exhibit 2    Plea Agreement and       25
             Sentencing Stipulations
Exhibit 3    Transcript of Change of  38
             Plea Hearing
Exhibit 4    Judgment, Dated 5/3/23   41
Exhibit 5    First Amended Complaint  44
Exhibit 6    Defendant Saeid Jaberian's 44
             Answer to Plaintiff's
             Amended Complaint
Exhibit 7    Plaintiff's Responses to 68
             Defendant Saeid Jaberian's
             First Set of
             Interrogatories
Exhibit 8    List of Trading Accounts 76
Exhibit 9    Email From Mark Miller,  84
             Dated 7/8/18
Exhibit 10   Transcript of Saeid      89
             Jaberian, Dated 9/17/20
Exhibit 11   Email Chain              98
Exhibit 12   Update Passphrase       105
             Confirmation
Exhibit 13   Email Chain             109
Exhibit 14   Email From Mark Miller, 112
             Dated 2/23/18
Exhibit 15   Email From Mark Miller, 114
             Dated 2/24/18
```

## Page 4

```
             INDEX (Continued)
NO.          DESCRIPTION            PAGE
Exhibit 16   Email Chain             118
Exhibit 17   Email From Mark Miller, 120
             Dated 2/25/18
Exhibit 18   Email From Mark Miller, 124
             Dated 2/25/18
Exhibit 19   Bell Buckle Holdings 8-K 128
             Report, Dated 2/20/18
Exhibit 20   Email From Mark Miller, 129
             Dated 2/26/18
Exhibit 21   Bell Buckle Holdings Press 131
             Release, Dated 2/28/18
Exhibit 22   Email Dated 8/24/18     140
Exhibit 23   Series of Posts Relating to 142
             BLLB, Beginning February
             28th
Exhibit 24   Email Chain             146
Exhibit 25   Screenshot of InvestorsHub 148
             Posts, Dated 8/29/18
Exhibit 26   Email Chain             157
Exhibit 27   Bell Buckle Holdings 8-K 160
             Report, Dated 8/31/18
Exhibit 28   Email Chain             162
Exhibit 29   Email From Mark Miller, 188
             Dated 3/21/19
Exhibit 30   Email Chain             198
Exhibit 31   Email From Mark Miller, 200
             Dated 3/17/19
Exhibit 32   Email Chain             201
Exhibit 33   Saeid Jaberian's Answers to 215
             SEC's Interrogatories
Exhibit 34   Plaintiff's First Set of 215
             Interrogatories to
             Defendant Saeid Jaberian
Exhibit 35   Saeid Jaberian's Answers to 227
             SEC's Request For Documents
Exhibit 36   SEC's First Set of Document 227
             Requests to Defendant Saeid
             Jaberian
Exhibit 37   Handwritten Note        228
Exhibit 38   Continuing Discovery From 240
             Saeid Jaberian

     (All excerpts quoted as said.)

     (EXHIBITS BOUND SEPARATELY)
```

**Page 25**

1  A. I believe so.
2      MS. QUALLS: I'm gonna hand you --
3      MR. JABERIAN: Yes.
4      MS. QUALLS: -- what I'll mark --
5  oh, yeah.
6      (Exhibit 1, Indictment, is marked for
7  identification.)
8      BY MS. QUALLS:
9  Q. This will be Exhibit 1.
10     And do you recognize this document?
11 A. Yeah, the first page. I never read through
12 it. So...
13 Q. Okay. The -- you see your name on the
14 caption; right?
15 A. Yes, right here.
16 Q. All right.
17 A. Number 3.
18 Q. And you -- there's no -- you will agree -- or
19 you -- you're not saying that this isn't the
20 indictment that you were charged with?
21 A. No, it is. It is in front of me.
22     MS. QUALLS: Okay. All right. So
23 then I'm gonna also give you Exhibit 2.
24     MR. JABERIAN: Mm-hmm.
25     (Exhibit 2, Plea Agreement and Sentencing

**Page 26**

1  Stipulations, is marked for identification.)
2      BY MS. QUALLS:
3  Q. This -- do you recognize this document?
4  A. Yes, ma'am. I went through it last night.
5  Q. Okay. Good.
6  A. Mm-hmm.
7  Q. All right. So let's -- let's take a look at
8  it. This is a plea agreement; correct?
9  A. Yes, ma'am.
10 Q. Okay. And this is the plea agreement that
11 you entered into in connection with your --
12 the charges that we just mentioned?
13 A. Yes, ma'am.
14 Q. And you were represented by counsel; is that
15 right?
16 A. Yes, I was.
17 Q. What was the name of your counsel?
18 A. Mr. Bill Mauzy and William Dooling.
19 Q. And William Dooling.
20 A. Yes, ma'am.
21 Q. Let's turn to the back page of the document.
22 A. Uh-huh.
23 Q. This is after paragraph 19, which says
24 "Complete Agreement." It says that "The
25 defendant acknowledges that he has read this

**Page 27**

1  plea agreement and has carefully reviewed
2  each provision with his attorney. The
3  defendant further acknowledges that he
4  understands and voluntarily accepts every
5  term and condition of this plea agreement."
6  Did I read -- is that -- do you see that?
7  A. Yeah, you did a good job.
8  Q. Thank you.
9      Is that true?
10 A. Yes, ma'am.
11 Q. Okay. And you see your signature?
12 A. Yes, ma'am.
13 Q. Okay. And this was signed on November 28th,
14 2022?
15 A. Yes, ma'am.
16 Q. And your lawyer also signed?
17 A. Yes.
18 Q. And so did the assistant U.S. attorney?
19 A. Yes.
20 Q. Okay. Let's flip the agreement back over --
21 A. Mm-hmm.
22 Q. -- and look at the terms of it.
23     On the front page it says, "The
24 Charges," and that's paragraph 1. And it
25 says "The defendant agrees to plead guilty to

**Page 28**

1  Count 9 of the indictment, which charges the
2  defendant with securities fraud." Do you see
3  that?
4  A. Yes, ma'am.
5  Q. And now, Count 9 concerns BLLB; is that
6  right?
7  A. Yes, ma'am.
8  Q. Okay. And then it goes on to say "The
9  defendant fully understands the nature and
10 elements of the crimes with which he has been
11 charged." Do you see that?
12 A. Yes, ma'am.
13 Q. And is that true?
14 A. Yes, ma'am.
15 Q. Okay. Now, let's move to the next page.
16     There is -- it starts paragraph --
17 or paragraph 2 with "Factual Basis." Do you
18 see that?
19 A. Yes, ma'am.
20 Q. And it says "The defendant is pleading guilty
21 because he is in fact guilty of Count 9 of
22 the indictment." Do you see that?
23 A. Yes, ma'am.
24 Q. And the defendant is you; right?
25 A. Yes.

**Page 29**

1  Q. Okay. And is that true? You pled guilty
2     because, in fact, you are guilty?
3  A. Yes, ma'am.
4  Q. Okay. And it also says "In pleading guilty,
5     the defendant admits the following facts, and
6     those facts" -- "and that those facts
7     establish his guilt beyond a reasonable
8     doubt." Do you see that?
9  A. Yes, ma'am.
10 Q. And is that true?
11 A. Yes.
12 Q. Okay. So let's -- I'd like to go through
13    some of the facts that are listed here.
14 A. Okay. What page?
15 Q. Stay -- stay with me on the page you're on.
16 A. Okay.
17 Q. And let's skip down to the last paragraph on
18    the page.
19 A. Mm-hmm.
20 Q. And it says "More specifically, in
21    February 2018 Defendant Jaberian participated
22    in a pump-and-dump scheme involving Bell
23    Buckle Holdings, Inc., a dormant public shell
24    company that traded over-the-counter under
25    the signal BLLB." Do you see that?

**Page 30**

1  A. Yes, ma'am.
2  Q. And is that true?
3  A. Yes, ma'am.
4  Q. And what is your understanding of what a
5     pump-and-dump is?
6  A. Well, I'm being -- I have been educated in
7     that word for last five years. I believe
8     here, when I sign this, "pump and dump" means
9     by any means you create some type of
10    atmosphere which is not true to raise the
11    price of a stock and benefits from it.
12         But back in 2018, I had no idea
13    what's pump-and-dump was. And I -- to be
14    honest with you, the first time I heard it, I
15    thought maybe it was a phrase from porn, you
16    know, because it just -- but, you know,
17    having three lawyers and, you know, I got
18    educated and now understand fully what is
19    pump-and-dump.
20 Q. Okay. And goes on to say in that same
21    paragraph "As part of the scheme, Jaberian
22    and his coconspirators bought the stocks in
23    Bell Buckle Holdings at low prices in the OTC
24    market. Jaberian was able to obtain millions
25    of shares because the stock traded at only a

**Page 31**

1     fraction of a penny per share." Is that
2     true?
3  A. Yes.
4  Q. Who were your coconspirators?
5  A. Well, at the time I didn't think I have any,
6     but I guess I have two: Mr. Mark Miller and
7     Mr. Rajkaran, which I never met.
8  Q. You've never met Mr. Rajkaran?
9  A. No.
10 Q. Okay. Let's move to the next page.
11 A. Page 3?
12 Q. Yes.
13 A. Okay.
14 Q. And it says -- starting at the top, it says
15    "After buying stocks in Bell Buckle Holdings,
16    Jaberian's coconspirators hijacked and took
17    control of the company by creating and filing
18    fake resignation letters and board minutes
19    purporting to announce the resignation of the
20    prior corporate officers and the appointment
21    of Jaberian as the new president and CEO."
22    Is that true?
23 A. If I signed it, yes.
24 Q. Okay. It also says next that "Jaberian then
25    submitted a request for access to the

**Page 32**

1     company's accounts with the SEC's electronic
2     data gathering analysis and retrieval --
3     EDGAR -- system, which allowed them to make
4     public filings on behalf of the company." Is
5     that true?
6  A. Yes.
7  Q. And that's something that you did; correct?
8  A. I applied for it, yes.
9  Q. Okay. Continuing, it says "Jaberian then
10    provided information used to draft a press
11    release announcing him as the CEO of Bell
12    Buckle Holdings." Is that true?
13 A. Yes.
14 Q. You provided the information?
15 A. Original information.
16 Q. And you provided that to Mr. Miller?
17 A. Yes, I did through email.
18 Q. Okay. "The press release which was" -- I'm
19    reading again. "The press release which was
20    later edited and expanded on by Mr." -- "by
21    Jaberian's coconspirators contained false
22    statements about Jaberian's background and
23    his intent run Bell Buckle Holdings as an
24    import/export business involving in bulk
25    leather sales." Do you see that?

**Page 33**

1  A. Yes, ma'am.
2  Q. And is that true?
3  A. It's true that it wasn't true.
4  Q. Well, the -- the -- it's true that the press
5     releases contained false statements?
6  A. Yes, it did.
7  Q. And those false statements concerned your
8     background?
9  A. To the extent, yes.
10 Q. And it also concerned -- the false statements
11    also concerned the intent to run Bell Buckle
12    Holdings as an import/export business?
13 A. Well, at that time, when I became a CEO, my
14    intention was to create a new company on the
15    side, do my -- due to my background. But it
16    didn't go well, and it never happened.
17 Q. Well, do you see, though, here what it says
18    and what you've sworn to in this plea
19    agreement?
20 A. Then it's true. If I signed it and, you
21    know -- then it's true.
22 Q. Okay. It goes on to say "Jaberian's
23    coconspirators used his" -- "this press
24    release to fraudulently inflate or pump up
25    the price of Bell Buckle Holdings stock." Do

**Page 34**

1     you see that?
2  A. Yes, ma'am.
3  Q. And is that true?
4  A. Yes.
5  Q. And then the last paragraph in this
6     Section 2, it says "While Jaberian was
7     willfully blind of the full nature of the
8     scheme, he benefitted from and took advantage
9     of it by selling his stock at the
10    fraudulently inflated prices. Jaberian made
11    a profit of approximately $67,034 from his
12    stock sales, although" -- "though he later
13    lost a portion of those profits due to
14    additional trading in Bell Buckle Holdings
15    stock." Do you see that?
16 A. Yes, ma'am.
17 Q. And that's true?
18 A. That's true.
19 Q. Okay. Did -- yup.
20 A. Can I ask you a question or no?
21 Q. Well --
22 A. If I don't, just tell me no. I can take it.
23 Q. You -- you can expand on an answer; you can't
24    really ask me a question.
25 A. No, this is regarding this statement.

**Page 35**

1  Q. Okay.
2  A. What does "blindfully" means?
3  Q. "Willfully blind" mean?
4  A. Yes, ma'am.
5  Q. Well, I'm not -- I'm not your lawyer and --
6  A. No, I'm just asking.
7  Q. -- I can't give you legal advice. I'm sure
8     that's something your attorney --
9     (Simultaneous cross talk.)
10       MR. JABERIAN: An English term.
11    That's all. You know, simple English term.
12    BY MS. QUALLS:
13 Q. Well, I'm sure your criminal defense lawyer
14    educated you about that.
15 A. If he has, you know, it's been two years.
16    I'm just curious how the word "blindfully" --
17    since it's in here should mean something.
18 Q. Well, it means in layman's terms -- and I
19    should say that this is -- you know, it's --
20    the judge decides what the law is, not an
21    attorney.
22 A. Okay.
23 Q. But it means that you close your eyes to the
24    legality of -- of something.
25 A. Absolutely true.

**Page 36**

1  Q. So you've sort of turned a blind eye to it.
2     You perhaps didn't know all the details, but
3     you knew it was improper.
4  A. Absolutely true.
5  Q. Okay. Now, let's -- okay. Let's turn to
6     page -- it's Number 13 and it's on page 9.
7  A. Okay.
8  Q. The paragraph at the top under "Forfeit" --
9     this is in the "Forfeiture" section. Is says
10    "The defendant consents to the entry of a
11    money judgment forfeiture in the amount of
12    $57,034." Do you see that?
13 A. Yes, ma'am.
14 Q. And it says that "The defendant agrees that
15    the amount of proceeds he obtained directly
16    or indirectly as a result of the securities
17    fraud scheme equals or exceeds that amount."
18    Do you see that?
19 A. Yes, ma'am.
20 Q. Now, that's true; right?
21 A. Yes.
22 Q. But you were never ordered to pay that
23    amount?
24 A. No.
25 Q. And you never paid it to the government?

**Page 37**

1  A.  Thanks God, no.  But I guess SEC is after it.
2      MS. QUALLS:  Okay.  Let's -- let me
3  just -- okay.  Let's put this aside, and I'm
4  gonna mark as Exhibit 2.
5      MR. MOYE:  3.
6      MR. JABERIAN:  Are we done with
7  this?
8      MS. QUALLS:  Oh, 3.
9      Just put it to the side.  You can
10 stack it there.
11     MR. JABERIAN:  Oh.  My stack is
12 gonna be higher than yours.
13     MS. QUALLS:  So this is gonna be 3.
14     MR. JABERIAN:  Can we -- can I ask
15 you a question regarding this plea?  Just an
16 English term, not -- I don't want to be -- I
17 don't want you to be my lawyer.
18     BY MS. QUALLS:
19  Q.  Uh-huh.
20  A.  Somewhere here I read last night, it says
21      knowingly or, slash, unknowingly in this --
22      if I am not mistaken.
23  Q.  Knowingly and willfully?  The paragraph in
24      the second page?
25  A.  Let me see it.  It is in the parentheses.

**Page 38**

1  Q.  Oh, it's in parentheses?
2  A.  Now, I'm becoming a lawyer.  If you -- if you
3      have a job, I'll take it.
4          I'm not mistaken.  You don't see
5      it, huh?
6  Q.  You thought it was in parentheses?
7  A.  Yeah, it says "knowingly" -- oh.  It says
8      "willingly" -- "knowingly and willingly and
9      voluntarily."  That's not good.
10         Okay.  I'll look for it later.
11 Q.  Yeah.
12 A.  I don't want to take your time.
13 Q.  Okay.  You can feel free to ask me later.
14 A.  Yes, please.  Thank you.
15     (Exhibit 3, transcript of change of plea
16     hearing, is marked for identification.)
17     BY MS. QUALLS:
18 Q.  Okay.  So now, I've handed you Exhibit 3 --
19 A.  Yes, ma'am.
20 Q.  -- which is the transcript of your guilty
21     plea.  Now, I don't know if you've ever seen
22     this before.  It --
23 A.  No, I haven't.
24 Q.  Okay.  There's a -- it's captioned "United
25     States versus Saeid Jaberian, also known as

**Page 39**

1      Andre Jaberian," and it's before Judge Doty.
2      It's -- it's -- the date is November 28th,
3      2022, and the title of the document is
4      "Change of Plea Hearing."
5  A.  Mm-hmm.
6  Q.  Okay.  So I just wanted to identify for you
7      or go -- go through this.  Do you recall
8      coming -- coming to court to plead guilty?
9  A.  Yes, ma'am.
10 Q.  And do you -- do you -- were you sworn in to
11     tell the truth?
12 A.  Yes, ma'am.
13 Q.  All right.  And you were represented by
14     counsel at that hearing?
15 A.  Yes, ma'am.
16 Q.  And starting on page 18, the judge asked you
17     some things about the factual basis that we
18     just went over; is that right?
19 A.  Yes, ma'am.  I mean, I don't remember, but if
20     it's here, it's true.
21 Q.  Okay.  And you -- so you had an opportunity
22     to talk to the judge about the factual basis;
23     right?
24 A.  Yes.
25 Q.  The judge asked you questions?

**Page 40**

1  A.  Mm-hmm.
2  Q.  Okay.  And then you answered them, and you
3      said that it was all true?
4  A.  True.
5  Q.  Okay.  And one of the -- and just -- just
6      focusing your attention to page 22.
7  A.  I trust you.
8  Q.  You jumped at it too quickly.
9  A.  22.  I told you I wasn't a good student; so I
10     don't like this.
11         Yes, ma'am?
12 Q.  So looking sort of towards the bottom, it
13     says -- the judge says, "Mr. Jaberian, you
14     didn't" -- "you weren't aware of all the
15     details.  Isn't that fair to say?"
16         Answer, "No."
17 A.  No.
18 Q.  Question, "But you were aware of your --
19     that -- that your coconspirators were, or you
20     kind of turned a blind eye to your
21     coconspirators' nefarious acts.  Is that fair
22     to say?"
23 A.  If I say yes --
24 Q.  And then you said, "Yes, sir."
25 A.  Okay.

Saeid Jaberian
9/20/2024

```
 1   Q.  And then it says, "And you also benefitted
 2       from it and took advantage of their actions;
 3       is that right?"
 4   A.  Yes.
 5   Q.  And you said, "Yes."  And that's true; right?
 6   A.  Yes.
 7   Q.  And finally, on page 24 at the top, the
 8       court -- the judge asks you, "I want to ask
 9       you, Mr. Jaberian, why are you pleading
10       guilty today?"  And you answer, "Well, I did
11       something wrong; so I'm here to admit it and
12       take responsibility."  Do you see that?
13   A.  Yes, and it's absolutely true.
14   Q.  Okay.  Let's put that aside.
15   A.  Good.
16   Q.  And I'm gonna --
17   A.  This was fun.
18           MS. QUALLS:  Let's look at
19       Exhibit 4, which is the judgment in your
20       criminal case.
21       (Exhibit 4, Judgment, dated 5/3/23, is marked
22       for identification.)
23           MR. JABERIAN:  Yes, ma'am.
24           You need more.
25           ///
                        41
```

```
 1       BY MS. QUALLS:
 2   Q.  Okay.  It says -- it's the caption again
 3       "United States versus Saeid Jaberian."  This
 4       is a judgment in a criminal case.
 5   A.  Yes, ma'am.
 6   Q.  It says you pleaded guilty to Count 9.
 7   A.  Mm-hmm.
 8   Q.  And we discussed that's Count 9 --
 9   A.  Yes, ma'am.
10   Q.  -- regarding BLLB.
11   A.  Yes, ma'am.
12   Q.  Inside, it -- and when you flip over to the
13       second page, it says that you are sentenced
14       to a term of two years prohibition as to
15       Count 9.
16   A.  Yes.
17   Q.  That was your sentence?
18   A.  Yes, ma'am.
19   Q.  Okay.  And it also states that -- on page --
20       let's see.  I guess it's page 4.  It says
21       there's some additional terms to govern your
22       supervision.
23   A.  Mm-hmm.
24   Q.  And, excuse me, one of the prohibitions, it
25       says, on Number 5.
                        42
```

```
 1   A.  You want to take a break?
 2   Q.  Let me just have a sip of water.
 3   A.  Sure.
 4   Q.  It says "Defendant is prohibited from
 5       soliciting funds from investors or having
 6       others solicit investment funds on his
 7       behalf, whether the funds are being for his
 8       personal benefit or for the benefit of his
 9       companies in which he owns, operates,
10       controls or is involved in any manner.  This
11       includes any type of investment, whether in
12       the form of equity or debt fundraising."  Do
13       you see that?
14   A.  Yes, ma'am.
15   Q.  And that's a condition of your probation?
16   A.  Yes.
17   Q.  And are you abiding by that condition?
18   A.  Yes, I am.
19   Q.  Okay.  And there was a hundred-dollar special
20       assessment?
21   A.  Mm-hmm.
22   Q.  And no, there wasn't any forfeiture order
23       that we've discussed; right?
24   A.  Thanks God.
25   Q.  Okay.  So let's put that aside, and I'm gonna
                        43
```

```
 1       hand you as Exhibit 5 and 6.
 2   A.  Mm-hmm.
 3   Q.  I'm gonna give you the complaint and your
 4       answer.
 5   A.  Complaint and answer.  Okay.
 6       (Exhibit 5, First Amended Complaint, is
 7       marked for identification.)
 8       (Exhibit 6, Defendant Saeid Jaberian's Answer
 9       to Plaintiff's Amended Complaint, is marked
10       for identification.)
11       BY MS. QUALLS:
12   Q.  Correct.  So Exhibit 5 is the complaint.
13   A.  Mm-hmm.
14   Q.  In this case.
15           And Exhibit 6 is your answer.
16   A.  Mm-hmm.
17   Q.  Okay.  Let me get my copies.  Okay.  Okay.
18           You're familiar with both of these
19       documents; right?
20   A.  I remember, yeah.
21   Q.  Okay.  So let's -- we've got the complaint.
22       Let's just put that to the side.  And now
23       we're gonna look at your answer, which is
24       Exhibit 6.
25   A.  Mm-hmm.
                        44
```

**Page 125**

1  Q. Okay. Did you ever ask Mr. Miller to give
2     you copies of the --
3  A. No.
4  Q. -- press releases that were coming out?
5  A. No.
6  Q. Did you ever ask him for copies of the 8-K?
7  A. No.
8  Q. Let me show you -- turn that back over.
9  A. Yes, ma'am.
10 Q. It says, again, the biography that we just
11    talked about --
12 A. Yes, ma'am.
13 Q. -- is in the draft.
14 A. Mm-hmm.
15 Q. And now there's some additions to the quotes.
16    Do you see that after --
17    (Simultaneous cross talk.)
18    (The deponent is reading indiscernibly to
19    himself.)
20       MR. JABERIAN: That's a lie.
21    That's not true. "We are pleased to see" --
22    no.
23    BY MS. QUALLS:
24 Q. Okay. So Mr. Miller said that he supplied
25    the quote and that the -- and the figures

**Page 126**

1     were a lie.
2  A. It is a lie.
3  Q. Okay. But you're saying that -- did you
4     provide him that information? No?
5  A. No, I didn't.
6  Q. You believe they made it up?
7  A. If I was making $7 million, my family, I
8     wasn't -- I wasn't -- I wouldn't be dealing
9     with Mark Miller.
10 Q. What were the gross revenues of your father's
11    business?
12 A. It varied. I mean, he died last year of
13    Alzheimer, but he was a very successful
14    businessman, and at the highest level, when I
15    went to Italy, he had over $2 million of
16    products in different warehouses in Salerno.
17    So he was between 1- to 2-million-dollar-type
18    merchant -- or our family was -- business.
19 Q. Okay. Did you...
20    (Sidebar.)
21    BY MS. QUALLS:
22 Q. Do you believe that you had any
23    responsibility for the press releases, given
24    that it was sent to you before it was
25    published?

**Page 127**

1  A. I had response -- that's why I accepted the
2     plea bargain. I had responsibility because I
3     was a CEO and generated the initial
4     information.
5  Q. Okay.
6  A. So yes.
7  Q. Okay. So you accept responsibility for
8     having received it --
9  A. Yes.
10 Q. -- before it came out?
11 A. I think we are past that.
12 Q. No, I know. I just want to make sure we're
13    on the same page.
14 A. No, no, I am. And I'm trying to be as
15    honest --
16 Q. Because you're -- sitting here today, you're
17    not trying to undermine your guilty plea?
18 A. No, no. One thing I learned on Google is if
19    I do that, I get into trouble. So...
20       MS. QUALLS: Okay. I'm gonna...
21       Okay. Let's go to the 8-K, which
22    is Exhibit 19.
23       Oh, and I put the sticker on the
24    wrong thing. All right. Hold on.
25       Over the one we used yesterday. So

**Page 128**

1     you have to -- I don't have a copy for you.
2     (Exhibit 19, Bell Buckle Holdings 8-K report,
3     dated 2/20/18, is marked for identification.)
4     BY MS. QUALLS:
5  Q. So here is Exhibit 19.
6  A. Mm-hmm.
7  Q. And then this is the 8-K for Bell Buckle
8     Holdings. And if you look on the next page,
9     you see that it's announcing your appointment
10    as CEO and sole director.
11 A. Mm-hmm.
12 Q. Do you see that?
13 A. Yes.
14 Q. Okay. And do you recall seeing the 8-K at
15    the time?
16 A. I might have, but I don't remember, to be
17    honest with you.
18 Q. Okay.
19 A. Should I put it away?
20 Q. Yeah, you can put it over there.
21 A. I make your job, guys, easy.
22 Q. What?
23 A. Anything I haven't respond, I don't know.
24    So...
25 Q. I understand. I just -- I still have to ask