# EXHIBIT 12

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF MINNESOTA
 3
 4   UNITED STATES SECURITIES     )
     AND EXCHANGE COMMISSION,     )
 5                                )
           Plaintiff,  ) Case No.
 6                     ) 21-CV-01445(DSD/ECW)
         v.            )
 7                     )
     MARK A. MILLER, SAEID        )
 8   JABERIAN, and CHRISTOPHER    )
     J. RAJKARAN,                 )
 9                     )
           Defendants.  )
10   _____)
11
12
13
14         VIDEOTAPED DEPOSITION OF
15              MARK A. MILLER
16       Thursday, September 19, 2024
17          Minneapolis, Minnesota
18
19
20
21
22
23
24   Reported By:
     Deanna Oaks, RPR
25   JOB No. 240919ARMN
```

Page 1

```
 1   APPEARANCES:
 2   FOR THE PLAINTIFF:
 3      UNITED STATES SECURITIES AND EXCHANGE
        COMMISSION
 4      175 West Jackson Boulevard
        Suite 1450
 5      Chicago, Illinois  60604
        Phone: 312.353.7390
 6      Email: quallsa@sec.gov
 7      By: Alyssa A. Qualls
            Robert M. Moye
 8
 9   FOR THE DEFENDANT:
10      LENGELING LAW
        310 Fourth Avenue
11      Suite 1050
        Minneapolis, Minnesota  55415
12      Phone: 612.500.5356
        Email: robert@lengelinglaw.com
13
        By: Robert Lengeling
14
15   ALSO PRESENT:
16      VIDEOGRAPHER
        Robert Buchman
17
18      DEFENDANT
        Saeid Jaberian
19      Appearing via Videoconference
20
21
22
23
24
25
```

Page 2

```
 1                I N D E X
 2   WITNESS:  MARK A. MILLER
 3   Examination by Alyssa A. Qualls:      6
 4   Witness's Certificate:              143
 5   Witness's Errata Sheet              144
 6   Reporter's Certificate:             145
 7
 8              E X H I B I T S
 9   EXHIBIT     DESCRIPTION          PAGE
10   Exhibit 1   Indictment            18
11   Exhibit 2   Plea Agreement and    19
                 Sentencing Stipulations
12   Exhibit 3   Third Amended Judgment in  30
                 a Criminal Case
13   Exhibit 4   Order For Forfeiture   32
14   Exhibit 5   Memorandum of Interview,  50
                 Dated 9/15/20
15   Exhibit 6   Memorandum of Interview,  50
                 Dated 12/17/20
16   Exhibit 7   Memorandum of Interview,  50
                 Dated 2/4/21
17   Exhibit 8   8-K Report For Bell Buckle  66
                 Holdings, Dated 2/20/18
18   Exhibit 9   Email From Mark Miller,  70
                 Dated 2/26/18
19   Exhibit 10  Bell Buckle Holdings Press  78
                 Release, Dated 2/28/18
20   Exhibit 11  Email From Jason Black,  82
                 Dated 2/27/18
21   Exhibit 12  Series of Posts, Dated   85
                 2/28
22   Exhibit 13  Update Passphrase        98
                 Confirmation, Dated
23               8/21/18
24
25
```

Page 3

```
 1            INDEX (Continued)
 2   NO.       DESCRIPTION           PAGE
 3   Exhibit 14  8-K Report For Simulated  101
                 Environment Concepts,
 4               Dated 7/18/18
     Exhibit 15  Series of Posts, related  104
 5               to Enviro-Gro, starting
                 9/6/18
 6   Exhibit 16  Consulting Contract, Dated  109
                 2/12/19
 7   Exhibit 17  Series of Posts Related to  115
                 Strategic Asset Leasing,
 8               Starting March 26th
     Exhibit 18  Series of Posts Related to  115
 9               Strategic Asset Leasing,
                 Starting May 28th
10   Exhibit 19  Email From Mark Miller,  132
                 Dated 3/21/19
11
12
13
14       (All excerpts quoted as said.)
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

Page 17

1  any representatives of the FBI or the
2  U.S. Attorney's Office and, you know, change
3  what you -- try to correct what you told them
4  at those meetings?
5  A. No, I don't -- I don't -- I don't think I
6  did.
7  Q. Okay. From your standpoint, everything that
8  you told them in those meetings was true and
9  correct?
10 A. Yes.
11 Q. All right. Now, I wanted to turn to your
12 federal securities fraud conviction. Okay?
13 So you were charged in an indictment; is that
14 right?
15 A. Yes.
16 Q. And that was here in this district, the
17 district of Minnesota?
18 A. Yes.
19 Q. And did those charges involve the tickers
20 DIGI, ECMH, BLLB, and UITA?
21 A. Yes.
22 Q. Okay. And I'm gonna -- let me just --
23       MS. QUALLS: Of course, I knew this
24 was gonna happen. I've pulled off the
25 microphone.

Page 18

1       Just pull this box closer to me, if
2  you would.
3       Okay. That's good.
4       It's fine. Put this on my lapel.
5  Okay. All right.
6  (Sidebar.)
7       MS. QUALLS: Okay. I'm gonna hand
8  you what I'm gonna mark as Exhibit 1.
9       Okay. Thank you.
10      Okay. So here is this.
11 (Exhibit 1, Indictment, is marked for
12 identification.)
13      MS. QUALLS: Hand it to you, and
14 this to you.
15      Done.
16 BY MS. QUALLS:
17 Q. Now what is this document?
18 A. The indictment.
19 Q. That's right. Have you seen this before?
20 A. Possibly. I don't remember it.
21 Q. Okay. This is -- it's charging -- it says
22 "United States of America versus Mark Allen
23 Miller." And it is a 20-page document
24 concerning the securities DIGI, ECMH, BLLB,
25 and UITA. Is this the indictment we were

Page 19

1  just talking about?
2  A. I would assume so.
3       MS. QUALLS: Okay. Let's -- I'm
4  gonna hand you what I'm gonna mark as
5  Exhibit 2.
6  (Exhibit 2, Plea Agreement and Sentencing
7  Stipulations, is marked for identification.)
8  BY MS. QUALLS:
9  Q. Okay. And let's -- this one hopefully will
10 be more familiar to you. What I've marked as
11 Exhibit 2 is a plea agreement and sentencing
12 stipulations, and it's captioned "United
13 States of America versus Mark Allen Miller."
14 It is a 12-page document. If you turn to the
15 back page, do you see your signature?
16 A. Yes.
17 Q. Okay. And do you recognize this as the plea
18 agreement in the criminal case we were just
19 referring to?
20 A. Yes.
21 Q. Okay. Now -- and so you -- did you --
22 pursuant to this agreement you pled guilty in
23 the criminal case; is that correct?
24 A. Yes.
25 Q. All right. And you pled guilty to Count 1,

Page 20

1  which is the conspiracy count, conspiracy to
2  commit securities fraud?
3  A. Yeah, I think it was just securities fraud,
4  but conspiracy to commit -- I don't remember
5  the whole word.
6  Q. Okay. If you take a look at Exhibit 2, and
7  you look at the paragraph 1 on the front
8  page, it says "Charges. The defendant agreed
9  to plead guilty to Count 1 of the indictment,
10 which charges the defendant with conspiracy
11 to commit securities fraud." Do you see
12 that?
13 A. Yes.
14 Q. Okay. So does that refresh your recollection
15 that it was a conspiracy count?
16 A. Yes.
17 Q. All right. Now, the -- I wanted to briefly
18 go over some of the -- what is said here in
19 the agreement. There's a paragraph on the
20 first page called "Factual Basis." Do you
21 see that?
22 A. Yes.
23 Q. And that runs on to page -- the top of
24 page 4, and it includes various statements
25 about what you did that -- in -- in this --

Mark Miller
9/19/2024

### Page 21

```
 1    in that case.  So I want to walk through
 2    that.  Okay?
 3         Do you see in the sentence,
 4    paragraph 2, Factual Basis, at the bottom it
 5    says it -- "In pleading guilty the defendant
 6    admits the following facts and that those
 7    facts establish his guilt beyond any
 8    reasonable doubt and constitute relevant
 9    conduct pursuant to the United States
10    sentencing guidelines"?  Do you see that?
11 A. Yes.
12 Q. And I just wanted to -- do you confirm here
13    today that the facts stated in this plea
14    agreement are true and correct?
15 A. Yes.
16 Q. Okay.  So in the plea agreement it states
17    that -- and I'm -- I'm starting at the -- the
18    bottom, towards the bottom of paragraph -- of
19    page 2.  It's the paragraph that says more
20    specifically -- it states that "Defendant
21    Miller participated in a scheme to hijack and
22    assume control over dormant public shell
23    companies and use that control to
24    fraudulently manipulate the price of the
25    companies' stock so that the conspirators
```

### Page 22

```
 1    could profit from the sale of stock and
 2    fraudulently inflate it and pump up prices."
 3    Do you see that?
 4 A. Yes.
 5 Q. And was that true?
 6 A. Yes.
 7 Q. And goes on to say that -- well, let me just
 8    ask you before we go on.  Were the dormant
 9    shell companies that you're referring to
10    here -- are DIGI, ECMH, BLLB, and UITA?
11 A. Yes.
12 Q. Okay.  Who did you participate in the
13    conspiracy with?  Who were your
14    coconspirators?
15 A. The defendants, Christopher Rajkaran and
16    Saeid Jaberian.
17 Q. Okay.  And as part of this criminal
18    conspiracy, you first identified dormant
19    shell companies; right?
20 A. We didn't identify them.  The list was
21    provided to us by Tashanie Narain.
22 Q. And she gave the list to Rajkaran, who gave
23    it to you?
24 A. She verbally gave the list to myself and
25    Rajkaran, yes.
```

### Page 23

```
 1 Q. And these were companies that were created
 2    over-the-counter?
 3 A. Yes, OTC.  Yes.
 4 Q. And after -- and once you had the list, did
 5    you start purchasing stock?
 6 A. I don't -- I don't recall how -- how the
 7    process went.  I don't recall what step was
 8    taken first or second.
 9 Q. Okay.  Fair enough.  So -- so did -- as part
10    of the criminal conspiracy, did you and your
11    coconspirators hijack all four public
12    companies:  BLLB, DIGI, UITA, and ECMH?
13 A. Yes.
14 Q. Okay.  And as part of the criminal
15    conspiracy, did you and your coconspirators
16    fraudulently inflate and pump up the price of
17    the companies' stock, those four companies?
18 A. I don't know how to answer that one
19    because --
20 Q. Well, let me ask -- let me withdraw it and,
21    like, reframe it a little bit.
22 A. Okay.
23 Q. As part of the criminal conspiracy, once you
24    had hijacked those four companies, did you
25    and your coconspirators issue fraudulent
```

### Page 24

```
 1    press releases and public filings that
 2    were -- had -- had false information to the
 3    public about the four companies?
 4 A. I don't recall the press release part, but
 5    the Twitter, the use of social media would
 6    usually be the route that would inflate the
 7    prices.
 8 Q. Okay.  Do you see at paragraph -- on page 3,
 9    the third paragraph from the bottom, it says
10    "Miller used his control over the hijacked
11    shell companies to issue fraudulent press
12    releases and public filings designed to
13    fraudulently inflate and pump up the price of
14    the hijacked companies' stock"?
15 A. Yes.
16 Q. Okay.  So is that true?
17 A. Yes.
18 Q. All right.  And then after the stock was
19    pumped up, you then sold your stock; is --
20 A. That is correct.
21 Q. -- that right?
22         Okay.
23 A. Sorry.  Sorry.
24 Q. No, no.  I know.  We'll both try.
25         Okay.  What is -- what is a dormant
```

**Page 25**

```
 1      public company?
 2   A. A company that would be inactive with the
 3      Secretary of State, delinquent on its
 4      filings, whether it's a non-SEC reporter or
 5      an SEC filer, absent of management. That
 6      would be three good indicators that it was
 7      abandoned as dormant.
 8   Q. Okay. What is a shell company?
 9   A. A shell would be the public vehicle that
10      would be open to putting in, like, new
11      business, wouldn't have current ongoing, you
12      know, activities.
13   Q. So a shell doesn't have any existing
14      business?
15   A. Right. Yes, correct.
16   Q. Okay. That's why it's called a shell? It's
17      just empty?
18   A. Yes.
19   Q. Okay. So what -- how would you define a
20      pump-and-dump?
21   A. Inflating a stock's price based on the
22      narrative via social media filings and/or
23      press releases that would cause investors to
24      make money.
25   Q. Okay. Let me break that down for a second.
```

**Page 26**

```
 1          If -- when you say "filings," does
 2      that include 8-Ks?
 3   A. Like an 8-K or other -- I guess there's, you
 4      know, like, form -- form 4, 13Gs, you know.
 5      I mean, there's a ton of different ones that
 6      EDGAR has. So I guess that would be...
 7   Q. Okay.
 8   A. You know, yeah, along that line.
 9   Q. So press releases, SEC forms filed on EDGAR,
10      and social media. Those are three ways that
11      you can disseminate information to the public
12      about a stock?
13   A. Yes.
14   Q. Okay. And the -- in a pump-and-dump, are
15      those three or -- is a pump-and-dump
16      typically characterized by the dissemination
17      of fake news by the company?
18   A. Yes.
19   Q. And is the purpose of the fake news to
20      generate public interest in the company such
21      that the stock price will rise?
22   A. Yes.
23   Q. Okay. And after the stock price rises, then
24      the people who are, you know, the --the
25      source of the fake news can sell their stock
```

**Page 27**

```
 1      and make money; is that right?
 2   A. That's correct.
 3   Q. Okay. So --
 4          Yes?
 5   A. May I clarify, though --
 6   Q. Yes.
 7   A. -- that pump-and-dumps can occur using real
 8      news. In this particular instance the news
 9      was likely illegitimate, based on the
10      indictment and the plea agreement. But I
11      don't want to create a broad paintbrush of
12      all pump-and-dumps that occur in the market.
13   Q. Fair enough. I appreciate -- you're being
14      very careful. I appreciate the distinction.
15      Was -- was the -- the -- the public
16      statements in press releases, social media,
17      and SEC filings in the four companies we're
18      talking about -- ECMH, BLLB, UITA, and
19      DIGI -- were -- those were false, though;
20      right?
21   A. Correct.
22   Q. All right. And can you briefly tell us just
23      how -- we've talked about the word "hijack."
24      How do you hijack a company?
25   A. The first step in hijacking a company is to
```

**Page 28**

```
 1      put yourself or your proxy in the Secretary
 2      of State filings to bring the company from an
 3      inactive status to an active status and then
 4      likely to pursue the transfer agent since
 5      they control the stock of the -- the public
 6      company. That's usually done by filing some
 7      type of formal notice, which is an 8-K
 8      through the EDGAR system.
 9   Q. How do you gain access to the EDGAR system?
10   A. You need a filing agent that will submit to
11      EDGAR a request for an updated passphrase,
12      which will allow you a passcode. I don't
13      know how that part works because I never saw
14      it. But then you would submit your
15      statement, and then it would get Edgarized
16      and become public -- public record.
17   Q. Okay. Who -- did you use a filing agent in
18      connection with the four stocks we've been
19      talking about?
20   A. I did.
21   Q. Who was that?
22   A. I don't remember her name.
23   Q. Was it Shelley Goff?
24   A. Yes.
25   Q. Okay. Great.
```

**Page 29**

1   Q.  And is it fair to say that the
2       information put in the press releases, the --
3       the filings, the SEC filings, or the social
4       media that you might use to pump up the price
5       of a stock for -- in this case for the four
6       that we were talking about, that the -- that
7       the kind of information is positive
8       information; is that right?
9   A.  Yes.
10  Q.  Because you're trying to -- to generate
11      interest in the stock?
12  A.  Correct.
13  Q.  All right. And let's, going back to -- I've
14      lost my -- oh, here it is.
15          MR. MOYE:  2.
16          BY MS. QUALLS:
17  Q.  Exhibit 2. Okay. The last...
18          Okay. Sorry. Can you tell us in
19      your own words -- you don't have to look at
20      that -- but what was Mr. Jaberian's role as a
21      coconspirator?
22  A.  He was a proxy to the BLLB public company.
23  Q.  And what do you -- when you say a "proxy,"
24      what do you mean by that?
25  A.  He was an extension for -- well, I had

**Page 30**

1       previously used my name in ECMH and DIGI; a
2       new face was needed. I convinced
3       Mr. Jaberian to be that face.
4   Q.  Okay. And while we -- I want to get into
5       that in detail, but just -- let me just round
6       out this criminal conviction issue.
7           I just wanted to introduce as
8       Exhibit 3 your judgment and order of
9       forfeiture. Exhibit 15 -- or -- sorry,
10      Exhibit 3. Let me find 3 -- is...
11         (Exhibit 3, Third Amended Judgment in a
12      Criminal Case, is marked for identification.)
13      BY MS. QUALLS:
14  Q.  This is called the "Third Amended Judgment in
15      a Criminal Case, United States versus Mark
16      Allen Miller."  Do you see that?
17  A.  Yes.
18  Q.  And it says at the top -- or below your name
19      it says that you pled guilty to Count 1. Do
20      you see that?
21  A.  Yes.
22  Q.  And it says the remaining counts were
23      dismissed. And on page 2 it says that you
24      were sentenced to a term of imprisonment of
25      12 months and a day as to Count 1. Do you

**Page 31**

1       see that?
2   A.  Yes.
3   Q.  Is that true?
4   A.  Yes.
5   Q.  And have you already served that time?
6   A.  Yes.
7   Q.  When did you get out of prison?
8   A.  April 9th, 2024.
9   Q.  Okay. And if you turn -- on page 3 it also
10      says that you're under supervised release for
11      a period of two years. Do you see that?
12  A.  Yes.
13  Q.  Are you currently on supervised release?
14  A.  Yes.
15  Q.  And if you turn to page 5, it says that -- or
16      a special -- a special condition of your
17      supervision, you are prohibited from
18      purchasing, trading, or selling stocks during
19      the term of supervision. Do you see that?
20  A.  Yes.
21  Q.  And are you complying with that --
22  A.  Yes.
23  Q.  -- supervision?
24  A.  Yes.
25          Sorry.

**Page 32**

1   Q.  That's all right.
2           Okay. And there is -- on the
3       page 7 at the bottom, there is a reference to
4       a forfeiture order. Were you ordered to
5       forfeiture -- forfeit money in this case?
6   A.  Yes.
7           MS. QUALLS: I'm gonna mark as
8       Exhibit 4 -- here's your forfeiture order.
9       (Exhibit 4, Order for Forfeiture, is marked
10      for identification.)
11      BY MS. QUALLS:
12  Q.  Okay. Now, do you recognize this order of
13      forfeiture signed by Judge Doty on May 30th,
14      2023?
15  A.  Yes.
16  Q.  And do you see on the second page that he
17      ordered you to forfeit $38,292?
18  A.  Yes.
19  Q.  And have you paid that money?
20  A.  Yes.
21  Q.  Okay.
22  A.  Plus the hundred-dollar assessment.
23  Q.  The special assessment, yes. Okay.
24          And did -- let me...
25          Okay. Who is Saeid Jaberian?