RECEIVED
MAR 21 2025
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

# EXHIBIT A

SCANNED
MAR 24 2025
U.S. DISTRICT COURT MPLS

```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA

UNITED STATES SECURITIES          )
AND EXCHANGE COMMISSION,          )
                                  )
         Plaintiff,   ) Case No.
                      ) 21-CV-01445(DSD/ECW)
    v.                )
                      )
MARK A. MILLER, SAEID             )
JABERIAN, and CHRISTOPHER         )
J. RAJKARAN,                      )
                                  )
         Defendants.  )
_____)


              VIDEOTAPED DEPOSITION OF
                   MARK A. MILLER
              Thursday, September 19, 2024
                 Minneapolis, Minnesota




Reported By:
Deanna Oaks, RPR
JOB No. 240919ARMN
```

Page 1

```
APPEARANCES:
FOR THE PLAINTIFF:
    UNITED STATES SECURITIES AND EXCHANGE
    COMMISSION
    175 West Jackson Boulevard
    Suite 1450
    Chicago, Illinois  60604
    Phone: 312.353.7390
    Email: quallsa@sec.gov
    By: Alyssa A. Qualls
        Robert M. Moye

FOR THE DEFENDANT:
    LENGELING LAW
    310 Fourth Avenue
    Suite 1050
    Minneapolis, Minnesota  55415
    Phone: 612.500.5356
    Email: robert@lengelinglaw.com

    By: Robert Lengeling

ALSO PRESENT:
    VIDEOGRAPHER
    Robert Buchman

    DEFENDANT
    Saeid Jaberian
    Appearing via Videoconference
```

Page 2

```
                    I N D E X
WITNESS: MARK A. MILLER
Examination by Alyssa A. Qualls:      6
Witness's Certificate:              143
Witness's Errata Sheet              144
Reporter's Certificate:             145


                   EXHIBITS
EXHIBIT       DESCRIPTION            PAGE
Exhibit 1   Indictment                18
Exhibit 2   Plea Agreement and        19
            Sentencing Stipulations
Exhibit 3   Third Amended Judgment in 30
            a Criminal Case
Exhibit 4   Order For Forfeiture      32
Exhibit 5   Memorandum of Interview,  50
            Dated 9/15/20
Exhibit 6   Memorandum of Interview,  50
            Dated 12/17/20
Exhibit 7   Memorandum of Interview,  50
            Dated 2/4/21
Exhibit 8   8-K Report For Bell Buckle 66
            Holdings, Dated 2/20/18
Exhibit 9   Email From Mark Miller,   70
            Dated 2/26/18
Exhibit 10  Bell Buckle Holdings Press 78
            Release, Dated 2/28/18
Exhibit 11  Email From Jason Black,   82
            Dated 2/27/18
Exhibit 12  Series of Posts, Dated    85
            2/28
Exhibit 13  Update Passphrase         98
            Confirmation, Dated
            8/21/18
```

Page 3

```
             INDEX (Continued)
NO.          DESCRIPTION             PAGE
Exhibit 14  8-K Report For Simulated 101
            Environment Concepts,
            Dated 7/18/18
Exhibit 15  Series of Posts, related 104
            to Enviro-Gro, starting
            9/6/18
Exhibit 16  Consulting Contract, Dated 109
            2/12/19
Exhibit 17  Series of Posts Related to 115
            Strategic Asset Leasing,
            Starting March 26th
Exhibit 18  Series of Posts Related to 115
            Strategic Asset Leasing,
            Starting May 28th
Exhibit 19  Email From Mark Miller,  132
            Dated 3/21/19



            (All excerpts quoted as said.)
```

Page 4

**Page 29**

```
 1      And is it fair to say that the
 2   information put in the press releases, the --
 3   the filings, the SEC filings, or the social
 4   media that you might use to pump up the price
 5   of a stock for -- in this case for the four
 6   that we were talking about, that the -- that
 7   the kind of information is positive
 8   information; is that right?
 9 A. Yes.
10 Q. Because you're trying to -- to generate
11   interest in the stock?
12 A. Correct.
13 Q. All right. And let's, going back to -- I've
14   lost my -- oh, here it is.
15     MR. MOYE: 2.
16   BY MS. QUALLS:
17 Q. Exhibit 2. Okay. The last...
18     Okay. Sorry. Can you tell us in
19   your own words -- you don't have to look at
20   that -- but what was Mr. Jaberian's role as a
21   coconspirator?
22 A. He was a proxy to the BLLB public company.
23 Q. And what do you -- when you say a "proxy,"
24   what do you mean by that?
25 A. He was an extension for -- well, I had
```

**Page 30**

```
 1   previously used my name in ECMH and DIGI; a
 2   new face was needed. I convinced
 3   Mr. Jaberian to be that face.
 4 Q. Okay. And while we -- I want to get into
 5   that in detail, but just -- let me just round
 6   out this criminal conviction issue.
 7     I just wanted to introduce as
 8   Exhibit 3 your judgment and order of
 9   forfeiture. Exhibit 15 -- or -- sorry,
10   Exhibit 3. Let me find 3 -- is...
11     (Exhibit 3, Third Amended Judgment in a
12   Criminal Case, is marked for identification.)
13   BY MS. QUALLS:
14 Q. This is called the "Third Amended Judgment in
15   a Criminal Case, United States versus Mark
16   Allen Miller." Do you see that?
17 A. Yes.
18 Q. And it says at the top -- or below your name
19   it says that you pled guilty to Count 1. Do
20   you see that?
21 A. Yes.
22 Q. And it says the remaining counts were
23   dismissed. And on page 2 it says that you
24   were sentenced to a term of imprisonment of
25   12 months and a day as to Count 1. Do you
```

**Page 31**

```
 1   see that?
 2 A. Yes.
 3 Q. Is that true?
 4 A. Yes.
 5 Q. And have you already served that time?
 6 A. Yes.
 7 Q. When did you get out of prison?
 8 A. April 9th, 2024.
 9 Q. Okay. And if you turn -- on page 3 it also
10   says that you're under supervised release for
11   a period of two years. Do you see that?
12 A. Yes.
13 Q. Are you currently on supervised release?
14 A. Yes.
15 Q. And if you turn to page 5, it says that -- or
16   a special -- a special condition of your
17   supervision, you are prohibited from
18   purchasing, trading, or selling stocks during
19   the term of supervision. Do you see that?
20 A. Yes.
21 Q. And are you complying with that --
22 A. Yes.
23 Q. -- supervision?
24 A. Yes.
25     Sorry.
```

**Page 32**

```
 1 Q. That's all right.
 2     Okay. And there is -- on the
 3   page 7 at the bottom, there is a reference to
 4   a forfeiture order. Were you ordered to
 5   forfeiture -- forfeit money in this case?
 6 A. Yes.
 7     MS. QUALLS: I'm gonna mark as
 8   Exhibit 4 -- here's your forfeiture order.
 9   (Exhibit 4, Order for Forfeiture, is marked
10   for identification.)
11   BY MS. QUALLS:
12 Q. Okay. Now, do you recognize this order of
13   forfeiture signed by Judge Doty on May 30th,
14   2023?
15 A. Yes.
16 Q. And do you see on the second page that he
17   ordered you to forfeit $38,292?
18 A. Yes.
19 Q. And have you paid that money?
20 A. Yes.
21 Q. Okay.
22 A. Plus the hundred-dollar assessment.
23 Q. The special assessment, yes. Okay.
24     And did -- let me...
25     Okay. Who is Saeid Jaberian?
```

Mark Miller
9/19/2024

**Page 37**

1 that never actually did.
2 **Q.** And why do you need these board resolutions?
3 **A.** You need to build a foundation for what makes
4 you the legitimate controlling party of -- or
5 I guess in his case the illegitimate
6 controlling party -- of that public company
7 you're pursuing.
8 **Q.** Did Mr. Tang provide you with templates about
9 these -- for these documents?
10 **A.** Yes, he did.
11 **Q.** Okay. And did you use those templates in
12 connection with the four stocks that we've
13 been discussing?
14 **A.** Yes, I did.
15 **Q.** And what -- did he also teach you about what
16 to do after you got control of the public
17 company?
18 **A.** Yes.
19 **Q.** What did he tell you?
20 **A.** Create debt.
21 **Q.** Okay. What does that mean?
22 **A.** Creating debt is to age debt with the stock
23 because there's a resting period to take
24 stock from restricted to unrestricted free
25 trading, followed by Rule 144 or Rule 4A1

**Page 38**

1 based on a two-year -- one-year or two-year
2 holding period.
3 **Q.** Did the four public companies we've been
4 talking about have this -- did you take debt
5 in connection with those?
6 **A.** No.
7 **Q.** Okay.
8 **A.** There was no debt taken in any of those.
9 These were surface hijackings, meaning they
10 didn't go very deep. It was in and out. You
11 know, at the end of the day, the companies
12 were -- well, ECMH, perfect example, was an
13 8-K, and when Mr. Webber pushed back, I filed
14 an 8-K to remove myself so that it was as if
15 it had never happened even though the damage
16 was already done.
17 **Q.** So after -- other than this debt issue, did
18 he -- Mr. Tang tell you anything else about
19 what to do after the debt?
20 **A.** Not that I recall. I mean, I had several
21 conversations with Mr. Tang, some of which
22 were made available to the FBI and DOJ but...
23 **Q.** Okay. Who -- who is Jason Black?
24 **A.** He was a stock marketer. So he would market
25 a stock, you know, and -- I don't know how

**Page 39**

1 they do it. I never really got involved with
2 that part. But you would pay a fee and they
3 would work on promotion.
4 **Q.** Okay. And what -- was he -- did you ever pay
5 him a fee in connection with the four stocks
6 we've been talking about?
7 **A.** I don't remember, but -- I don't -- I don't
8 want to say something that's inconsistent
9 with the proffers that I've previously given.
10 So --
11 **Q.** I understand. I'm not trying to catch you in
12 any --
13 **A.** Right. Yeah.
14 **Q.** -- memory test.
15 **A.** So I don't remember if I ever did or not.
16 **Q.** Okay.
17 **A.** I could have. I don't recall.
18 **Q.** Did -- did Mr. Black work on social media, or
19 was he more in the realm of press releases?
20 **A.** Never got involved with his side of promotion
21 or marketing; so I don't know how he made the
22 information available.
23 **Q.** Okay. What -- what -- can you describe
24 Mr. Jaberian's role in the pump-and-dump
25 scheme that we've been talking about.

**Page 40**

1 **A.** He was -- well, for BLLB he was just the face
2 of the company.
3 **Q.** Okay.
4 **A.** In regards to the other three, you know,
5 Mr. Jaberian never shared with me the
6 purchase prices he bought at or sold at. I
7 don't know how much he made. Any indictment
8 disclosures for illicit gains, I would have
9 to take the DOJ at their word because
10 Mr. Jaberian was very private about that, and
11 I never had access to his accounts or
12 anything like that. So as far as the one
13 BLLB company, that was the only one that I
14 personally feel he participated in at my
15 request to be the face of the company --
16 **Q.** Okay.
17 **A.** -- and to give me a concept idea to use in a
18 press release to pump the stock.
19 **Q.** Okay. So you -- did you ask Mr. Jaberian to
20 be the CEO of BLLB?
21 **A.** I did.
22 **Q.** And why did you ask him to do that?
23 **A.** Because my name had already been on two
24 different public companies. So in essence, I
25 was getting what some may refer to as "burnt"

Page 41:

```
1   in the public eye, that people would say, Oh,
2   don't buy into that Mark Miller stock. You
3   know, it's just a pump-and-dump.
4  Q. Okay. And did you -- did you tell
5   Mr. Jaberian that you -- your name was burnt?
6  A. I don't recall if I told him that or not.
7  Q. Did -- did you -- did Mr. Jaberian agree to
8   be the CEO?
9  A. He did.
10 Q. And did you help him become the CEO?
11 A. Yes, I did.
12 Q. And what -- did that involve working with
13  Shelley Goff and getting access to EDGAR?
14 A. I believe so and filing -- I think BLLB was
15  in the state of Florida. So that would have
16  been me doing the state filings for Florida.
17 Q. And that would be telling the state --
18  telling Florida Secretary of State's office
19  that Mr. Jaberian was now the new CEO?
20 A. Controlling party, that's correct.
21 Q. And then once you had that done, you then
22  went to use Ms. Goff to get access to the
23  EDGAR system?
24 A. Yes.
25 Q. And when you...
```

Page 42:

```
1   (Sidebar.)
2   BY MS. QUALLS:
3  Q. Did Mr. Jaberian do anything legitimate as
4   the CEO of BLLB?
5  A. No, he followed my lead.
6  Q. Okay. Well, in your -- was he a legitimate
7   CEO?
8  A. No.
9  Q. Okay. So -- because we talked about before a
10  legitimate CEO and an illegitimate CEO;
11  right?
12 A. Yes.
13 Q. So in your view, he -- Mr. Jaberian was not a
14  legitimate CEO of BLLB?
15 A. No.
16 Q. Okay. And how do you know that?
17 A. Because the documents that -- well, you know,
18  I guess no one contested it, but I -- they
19  were part of the indictment, and, you know,
20  ultimately we all pled guilty to it. So...
21 Q. Well, you --
22 A. That's kind of a tough question to answer --
23  sorry -- because, you know, I knew he was
24  illegitimate. Did he know he was
25  illegitimate? He probably thought he was
```

Page 43:

```
1   legitimate at -- at some point, you know.
2   And I do remember that Tashanie Narain had --
3   had control of the Twitter account, and she
4   had posted something to cause the stock to
5   pump, and Mr. Jaberian was extremely upset
6   about it and immediately wanted to distance
7   himself from it.
8       So I just -- I want to make sure
9   that -- once again, that I'm telling the
10  truth to the best of my accuracy where it
11  doesn't -- so it's not inconsistent with my
12  previous proffers.
13 Q. I understand.
14 A. Yeah.
15 Q. So to the best of your knowledge, what was
16  the extent of Mr. Jaberian's role as the CEO?
17 A. The proxy CEO face of the company and to
18  provide a -- a business concept, an idea for
19  me to be able to prepare a press release off
20  of.
21 Q. And so did Mr. Jaberian provide you with this
22  business concept?
23 A. Yes.
24 Q. Was there any -- did -- did you believe that
25  the business concept that he provided to you
```

Page 44:

```
1   was gonna be the real business of BLLB?
2  A. At that time, I did believe that the
3   Solumbour business was legitimate out of the
4   Middle East.
5  Q. Okay. Well, let's -- that's -- I think
6   that's -- I understand --
7   (Simultaneous cross talk.)
8       THE WITNESS: Sorry.
9   BY MS. QUALLS:
10 Q. Okay.
11 A. Maybe I didn't understand the question.
12 Q. Fair enough. Let me try to rephrase.
13      I'm not asking whether this
14  Solumbour business was legitimate in the
15  Middle East. I'm asking whether BLLB as a
16  U.S. shell was gonna be in the -- the
17  business of -- actually be the business of
18  leather import and export.
19 A. That was the intention eventually; however,
20  that goes back to Richard Tang and what he
21  referred to as "the long game," being the
22  more time that passes, the further it
23  legitimizes your illegitimate actions, which
24  would be the actions I took to get
25  Mr. Jaberian there. Does that make sense?
```

Mark Miller
9/19/2024

**Page 93**

1  Q. Okay. Did you believe that Mr. Jaberian knew
2     after he got out of BLLB that what he was
3     involved in was a pump-and-dump?
4  A. In my opinion, yes.
5  Q. Okay. And how -- why do you believe that?
6  A. Because it mimicked the same characteristics
7     of a pump-and-dump. You know, the price went
8     up, everybody made money; Hey, this is
9     another way to produce revenue or, you know,
10    put money in your pocket. Gives you an
11    inside edge against, you know, trading the
12    market traditionally. Just my opinion. I
13    don't -- I don't recall.
14 Q. Do you recall -- so did you -- do you recall
15    telling Mr. Jaberian to buy the UITA stock?
16 A. I don't recall telling him to, but I probably
17    did if he -- if he traded it.
18 Q. Okay. And did you tell Mr. Jaberian that you
19    were gonna hijack UITA?
20 A. I don't recall ever discussing with him that
21    I was hijacking any of the companies.
22 Q. Okay. Did he ever ask you any questions
23    about who was the CEO?
24 A. Of UITA?
25 Q. Yeah.

**Page 94**

1  A. Oh, I don't remember. I -- well, if he
2     saw -- he knew my brother's name; so I'm
3     assuming that if he saw Richard he would
4     know, oh, that's your brother.
5  Q. Did he ever ask you, like, How did your
6     brother become CEO of UITA?
7  A. No.
8  Q. What -- why not?
9  A. I don't remember ever having a conversation
10    with him about it.
11 Q. Okay. Did he ever ask about what the
12    business of UITA was?
13 A. I don't remember. I don't think so.
14 Q. Did he ever ask you why you expected UITA to
15    be a profitable investment?
16 A. I don't remember. That's a good question.
17    Probably because of the -- I probably let him
18    know that, Hey, this one I think will run
19    because it had a very low share structure. I
20    do remember UITA had a very low outstanding
21    share count. And when you would look at
22    Level 2 on thinkorswim with TD Ameritrade, I
23    noticed that there was oftentimes a huge
24    spread between the bid and the ask or between
25    market makers on the ask. So if someone

**Page 95**

1     wanted to move UITA from triple zero five to
2     double zero seven, it may only cost you a
3     thousand dollars to do it because there was
4     no stock in between, you know. But this is
5     just from my perspective.
6  Q. Right. What's thinkorswim?
7  A. Thinkorswim is a platform that TD Ameritrade
8     provides to your average joe trader that
9     gives you live trading, buying and selling,
10    shows market makers that are on the ask -- or
11    on the bid, and mark makers that are on the
12    ask so you can see real-time trades
13    occurring. And a lot of traders use that as
14    a tool to project, Is it going up? Is it
15    coming down? And trade accordingly, if
16    they're day traders or whatever they're
17    doing, you know.
18 Q. Is that one of the sources you looked at to
19    decide what company to hijack?
20 A. I didn't use TD Ameritrade as a source
21    necessarily. Like, it wasn't my consistent
22    go-to as opposed to, like, the lack of
23    filings and whatnot. But -- but when we
24    would purchase shares in stock of it, you
25    bet, before anything occurred, how easily

**Page 96**

1     could this move when I would buy at triple
2     zero whatever, you know? And so, yeah, I --
3     I don't want to -- jeez, I don't want to say
4     I relied on it heavily, but it could
5     definitely have been a factor.
6  Q. And so that was one of the data points that
7     you looked at to -- to be able to help
8     predict how fast the stock would move based
9     on the fake news?
10 A. I could say that at that time -- well,
11    knowing what I know now about thinkorswim, I
12    would use it as a tool to trade, yes, but --
13    but not for the hijacking part. I'm just
14    saying.
15 Q. But more for where the stock is gonna move
16    after?
17 A. Yeah. Yes, just as an indicator.
18 Q. And do you recall ever discussing any of
19    those, your predictions, about the stocks
20    with Mr. Jaberian?
21 A. I don't remember.
22 Q. Okay. Did -- did you ever -- can you think
23    of anything else you might have told
24    Mr. Jaberian about UITA?
25 A. No, I don't -- I don't remember.

## Page 141

1  tomorrow.
2       MS. QUALLS: Okay. We're looking
3  forward to seeing you. Okay.
4       MR. JABERIAN: Thank you.
5       MS. QUALLS: Okay. Thank you.
6  I'll -- all right. So I'm...
7       MR. MOYE: Do you have any?
8       MR. LENGELING: I don't have any
9  questions.
10      MS. QUALLS: Oh, you don't have any
11  questions.
12  (The reporter inquires about the option to
13  read and sign the transcript.)
14      MR. LENGELING: I'm sorry?
15  (The reporter inquires about the option to
16  read and sign the transcript.)
17      MR. LENGELING: Oh, yes.
18  (The reporter requests transcript order
19  details.)
20      MS. QUALLS: We have a standing
21  order with Gradillas; so I don't know -- and
22  we don't want to change that. So that's what
23  our order will be.
24      MR. LENGELING: I guess I don't
25  know either. I haven't had to order a

## Page 142

1  transcript from -- you know, privately for so
2  long. Usually I just order from the courts,
3  and so tell me what I'm doing here.
4  (There is a brief off-record discussion
5  regarding details.)
6       MR. LENGELING: Do you want the
7  video?
8       We'll just get the e-copy of the
9  transcript.
10      MR. BUCHMAN: We're going off the
11  record. The time now is 2:23 P.M., and this
12  concludes today's testimony given by Mark
13  A. Miller.
14  (The deposition is adjourned at 2:23 P.M.)

## Page 143

CERTIFICATE OF WITNESS

I, MARK A. MILLER, do hereby declare under penalty of perjury that I have read the entire foregoing transcript of my deposition testimony, or the same has been read to me, and certify that it is a true, correct and complete transcript of my testimony given on September 19, 2024, save and except for changes and/or corrections, if any, as indicated by me on the attached Errata Sheet, with the understanding that I offer these changes and/or corrections as if still under oath.

\_\_\_\_\_ I have made corrections to my deposition.

\_\_\_\_\_ I have NOT made any changes to my deposition.

Signed: _____
         MARK A. MILLER

Dated this _____ day of _____ of 20\_\_\_.

## Page 144

ERRATA SHEET
Deposition of: MARK A. MILLER
Date taken: SEPTEMBER 19, 2024
Case: SEC v. MARK A. MILLER, et al.
PAGE  LINE
\_\_\_\_\_ \_\_\_\_\_ CHANGE: _____
             REASON: _____
\_\_\_\_\_ \_\_\_\_\_ CHANGE: _____
             REASON: _____
\_\_\_\_\_ \_\_\_\_\_ CHANGE: _____
             REASON: _____
\_\_\_\_\_ \_\_\_\_\_ CHANGE: _____
             REASON: _____
\_\_\_\_\_ \_\_\_\_\_ CHANGE: _____
             REASON: _____
\_\_\_\_\_ \_\_\_\_\_ CHANGE: _____
             REASON: _____
\_\_\_\_\_ \_\_\_\_\_ CHANGE: _____
             REASON: _____
\_\_\_\_\_ \_\_\_\_\_ CHANGE: _____
             REASON: _____
\_\_\_\_\_ \_\_\_\_\_ CHANGE: _____
             REASON: _____
\_\_\_\_\_ \_\_\_\_\_ CHANGE: _____
             REASON: _____
Signed_____
Dated_____

```
 1   STATE OF MINNESOTA
                  CERTIFICATE
 2   COUNTY OF HENNEPIN
 3          I, Deanna Oaks, hereby certify that
     I reported the deposition of MARK A. MILLER
 4   on the 19th day of September, 2024, in
     Minneapolis, Minnesota, and that the witness
 5   was by me first duly sworn to tell the truth
     and nothing but the truth concerning the
 6   matter in controversy aforesaid;
 7          That I was then and there a notary
     public for the County of Hennepin, State of
 8   Minnesota; that by virtue thereof I was duly
     authorized to administer an oath;
 9
            That the foregoing transcript is a
10   true and correct transcript of my
     stenographic notes in said matter,
11   transcribed under my direction and control;
12          That the cost of the original has
     been charged to the party who noticed the
13   deposition and that all parties who ordered
     copies have been charged at the same rate for
14   such copies;
15          That the reading and signing of the
     deposition was not waived;
16
            That I am not related to any of the
17   parties hereto, nor interested in the outcome
     of the action and have no contract with any
18   parties, attorneys or persons with an
     interest in the action that has a substantial
19   tendency to affect my impartiality.
20          WITNESS MY HAND AND SEAL this
     29th day of September, 2024.
21
22                  _____
                        Deanna Oaks, RPR
23              Secretary of STAR – Stenograph
                  Technology Agencies Reporters
24
25
                         145
```

# EXHIBIT B

TO: UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA
FROM: J. Scott Webber                                                              Date: 3-12-2025
     CEO Encompass Holdings, Inc. (ECMH)
RE: Case No. 21-CV-01445 (DSD/ECW)  DOC. 130  Filed 02/21/25
    PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
    AGAINST DEFENDANT SAEID JABERIAN

My name is J. Scott Webber. I am the CEO of Encompass Holdings Inc. (ECMH) and held that position when a Mark Miller hijacked ECMH.

I am the whistleblower that reported Mark Miller to FINRA in Nov. 2017 as he was attempting to hijack ECMH. As a victim I request that all evidence be ruled upon by a jury. I believe the findings I will describe brings the whole DOJ case into question.

I object to any Summary Judgment Motion in this case for numerous reasons some of which I will describe below.

I submitted a letter to the court during the DOJ case which is attached to this letter as Ex. 1. I sent that information to all involved in DOJ and SEC Mark Miller cases over 3 years ago. I questioned Mark A. Miller's identity then and provide more information on the subject in this letter supporting the objection to a summary judgment filed by defendant Saeid Jaberian.

This is a case of stolen identities, forged documents and securities fraud that involved far more than the defendants named in these two cases. I have been following this case closely to see if the SEC identifies all involved and their actual identities some of which I have disclosed to them in the past.

The actual identity of defendant Mark A. Miller has been overlooked in both cases in my opinion. I base that opinion on the following information that is public information provided by the SEC itself.

1. The SEC complaint Mark Miller.
   *Defendants*
   *12. Mark A. Miller, age 43, is a resident of Pequot Lakes, Minnesota. His last known occupation was in the construction arena, including buying homes, overseeing home improvement projects on the homes, and then buying or renting the properties.*

2. The DIGI and ECMH hijacker Mark Miller is identified in EDGER filed documents and is not the same person as identified in the SEC complaint.
   Digitiliti Inc – '8-K' for 6/15/17
   https://www.secinfo.com/d1F7Qk.k7c.htm
   Encompass Holdings, Inc. – '8-K' for 10/20/17
   https://www.secinfo.com/d1F7Qk.k79.htm
   Miller Mark A  SEC # 1168420
   This Mark A Miller is not the defendant in either case, DOJ or SEC.
   https://www.secinfo.com/$/SEC/Name.asp?S=mark%20a%2E%20miller#S

3. **This is the Mark Miller that resigned his ECMH position after I reported him to FINRA. A different Mark Miller than the one that hijacked ECMH and also not the defendant in these cases.**
   Encompass Holdings, Inc. – '8-K' for 11/14/17

*[signature]* p9 /

Miller Mark SEC # 1737949
https://www.secinfo.com/$/SEC/Registrant.asp?CIK=1737949
This Mark Miller is a different person than the one that hijacked ECMH and also is not the defendant Mark A Miller.

Who is defendant Mark A. Miller? The SEC complaint claims he's the brother of Richard and Philip Kilchesky who he used as proxys in his UITI hijack.

*80. On March 13, 2018, Miller filed a certificate of reinstatement for UITA in the Secretary of State of Nevada and paid UITA's outstanding fees. He also submitted additional paperwork falsely identifying his brother as UITA's President and Director ("UITA Nominee 1"), another brother as UITA's Treasurer ("UITA Nominee 2"), and himself as UITA's Secretary.*
https://www.secinfo.com/d1F7Qk.jw.htm

I did some additional research into the Kilchesky brothers who were not named as defendants despite their position as the same type of proxy as that of defendant Saeid Jaberian. I found that there is a third Kilchesky brother named Mark that has the same birth date as defendant Mark A Miller.
https://www.truepeoplesearch.com/find/person/p2u46u982280l20n2r60

file:///C:/Users/Scott/Documents/MARK%20MILLER%20RELATED%20INFO%20DOCUMENTS/MarkAllenMiller-InstantCheckmateReport.pdf

It appears defendant Mark Miller is or was Mark A Kilchesky and may be a proxy of the actual Mark Millers that hijacked numerous corporations

Relatives of Richard Kilchesky in Pequot Lakes, MN
https://www.fastpeoplesearch.com/richard-kilchesky_id_G27338248827929999434

<u>Mark Kilchesky</u>
    Age 47 (Jul 1977)
<u>Phillip Kilchesky</u>
    Age 37 (Oct 1987)

Above is just a portion of the information I've researched that brings into question, who was the Mark Miller that the DOJ presented to a Grand Jury. If the information I've provided is factual any defendant admissions would likely be in question. The prior information I submitted during the DOJ case seems to have been ignored or hidden. My intent now is to get this info into the court record in this SEC case so that the actual truth can be presented to a jury.

I don't believe it would be fair to Mr. Jaberian or me or even in the SEC's best interest to keep any disputed evidence from the jury at trial via a Summary Judgment. The facts presented in both of my letters to the court support Jaberian's objection to summary judgment based on disputed claims of defendant Mark Miller's actual identity and should be presented to a jury as requested by Mr. Jaberian.

J. Scott Webber
CEO Encompass Holdings, Inc.

*[signature]*

pg 2

From: James Scott Webber    Victim Identification Number (VIN)
'6151199'                        Date: 2-5-2022
To: United States District Court, Judge David S. Doty
CC: United States Attorney's Office, Joseph Thompson
    F.B.I. Agent Jared Kary
    UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
        Alyssa A. Qualls (IL No. 6292124)
        Amy S. Cotter (IL No. 6238157)
        Raven A. Winters (IL No. 6291077)
    United States Attorney's Office, Craig R. Baune, Attorney ID No. 331727
RE: Case Number 2019R00271 and Court Docket Number 21-CR-00142
    Case: 0:21-cv-01445-DSD-KMM
Pages:3

My name is Janes Scott Webber. I am 71 years old. I have never been arrested or convicted of any crime. I am the C.E.O. of Encompass Holdings Inc. I am the Whistleblower in the two cases identified above. I reported the hijack of Encompass Holdings to F.I.N.R.A. In November 2017. Shortly after reporting the hijack I was interviewed by Raven Winters representing the S.E.C The hijack was commited by a person calling himself Mark A. Miller and was accomplished by stealing my identity and forging documents that Miller filed with E.D.G.A.R. The document was a Form 8k that claimed a Board of Directors meeting was held where I resigned and Miller was appointed CEO and sole Director of Encompass Holdings. Miller either forged my signature or EDGAR accepted documents without my signature.

Within about a weeK I discovered Miller's fraud and contacted FINRA that same day. I also confronted Miller by email concerning his fraud and identity theft. The details are described in the SEC case documents.

In 2019 I was contacted by the U.S. Postal Service and the FBI concerning the Miller hyjack of Encompass Holdings. I provided them with the same details I had provided Raven Winters (SEC).

At that point it became clear to me that the investigation was more than a simple "pump and dump" scheme involving Miller alone.

I attempted to get more details on the investgation but was told by all those investigating Miller that they could not share no information with me.

At that time (2019) I started looking deeper into Mark Miller myself using SECINFO.com. And internet search engines  Using that information I could see that Miller was attempting the same hijacking with other corporations and EDGAR had accepted fraud documents filed by Miller again despite my 2017 information provided to FINRA and the SEC. If I remember correctly the Mark A. Miller identity was linked to 15 other SEC fileing corporations.

All of this information was public information and easy to find.

I could also see that Miller was part of a team that included Defendant Jaberian, his brothers

Pg. 1 of 3

Richard and Philip Kilchesky and others Miller placed in key positions at the various hijacked corporations.

It wasn't until the DOJ and SEC filed their cases in June 2021 that I knew for sure that the Kilchesky's were Millers brothers. At that point I started to investigate the Kilchesk family. It was again easy to see that the Kilchesky brothers had a brother named Mark A. Kilchesky who at some time after 2011 started using the name Mark A. Miller  As Mark Miller he established residence in Breezy Point, Minnesota and ran for and won a seat on the Breezy Point Cith Counsel. These acts were of no surprise to me knowing that both cases involving Miller were based on fraud and forgery.

In 2021 after the cases were filed I contacted the SEC, FBI and DOJ with my belief that the indicted individual Mark A. Miller was actually Mark A. Kilchesky.

Sometime after the cases were filed and I was personally designated a victim I received an email threat from Mark Miller telling me to leave his family out of the picture and if not Karma would be a bitch for me. I notified the DOJ, FBI and SEC of that threat. From that day to now this has become a very serious case with me and I demand the true facts be known and reflected in the court documents in each case. If not I nor my family have protection.

The DOJ has named me personally as a victim with all rights granted in the Victim Protection Act. Those rights include protection and restitution. If the true identity of Mark A Miller is not made clear to the court and documented both my protection and restitution are greatly compromised in an attempt to accept a plea deal from Mark Miller. The court should identify who I'm actually protected from if the defendant Miller uses other identities.

In addition I became aware that the same Mark A. Miller was attempting to hijack another company named New Wold Gold. He again filed forged documents in Florida in that hijack attempt. I contacted a company that Miller claimed to have hired to do mining exploration work. The CEO of that company confirmed the Miller contact and emailed me a copy of a cashiers check that Miller used for that exploration work. He told me the check was forged. I sent a copy of that check to the SEC attorney and DOJ attorney assigned to the Miller cases. As of my last emailed information from the company CEO no one has contacted him about the suspected forged check. The check was signed by two individuals other than Miller and was from a bank in OHIO.

I am again acting as a whistleblower and providing what I have found. I don't care at all about my name as a whistleblower becoming public information. I've submitted two additional whistleblower statements via The SEC Whistleblower Program on my findings concerning the cases and events I found.

I don't feel that I'm receiving the protection and restitution provided in the Victim Protection and Restitution Act the DOJ has granted me. I'd like this letter / statement to be placed in the case record in both the DOJ case and SEC case. I have found that Mark Miller and Saied Jaberian are linked to numerous corporations in numerous states. If true that makes my personal proection a critical situation. It also impacts the restitution available to me if facts are hidden in these cases. I will be using restitution funds I receive to protect myself from numerous individuals connected with the cases defendants.

Pg. 2 of 3

The most effective protection I can receive is the truth and indentification of all individuals involved with this group. There are many. Despite the evidence showing four Kilchesky family mrmbers were involved in the forgery and fraud not one is listed as a defendant in eith case. I clain four because Mark's wife Jennifer is also involved per my findings.

In light of my findings and the direct threat I've received from Miller I demand that neither the DOJ or SEC accept any plea deal from Mark Miller or Saeid Jaberian and that both go to trial by jury and that my findings and opinion (this letter) be entered as case documents that anyone interested can find in a PACER search regarding both cases.

I don't feel that I should have to file a Complaint and endure the cost to do so in order to expose the information I've found with far less ability to do so than that of the DOJ, FBI and SEC. I did nothing to attract the identity theft, fraud and threat I've received but I want to make it very clear to all involved that I demand the whole truth, and all facts be made public and clear, that I receive all protection and restitution available as a victim and original whistleblower that initiated the various investigations and prosecution of the three individuals indicted in each case. I also demand that the information I provided on the suspected forged check used by Miller and the continued fraud now occuring by the individuals placed in the various hijacked companies by both Miller and Jaberian be honestly investigated and prosecuted as the law provides. If accurate additional individuals are involved and bank forgery charges should be investigated.

Respectivly
J. Scott Webber

signature: *[signed]*
CEO Encompass Holdings Inc.
Victim Identification Number (VIN) '6151199'

Pg. 3 of 3

**CALIFORNIA ACKNOWLEDGMENT**  CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of ____Shasta____ }

On __2-5-2022__ before me, __Maria A. Geers__,
      Date                          Here Insert Name and Title of the Officer

personally appeared __J. Scott Webber__
                             Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

[Notary Seal: MARIA A. GEERS, Notary Public - California, Shasta County, Commission # 2300848, My Comm. Expires Aug 10, 2023]

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature __Maria A. Geers__
            Signature of Notary Public

Place Notary Seal and/or Stamp Above

---- OPTIONAL ----

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: __3 pg Letter from J Scott Webber to US Dist. Court, Judge Doty__
Document Date: __2-5-2025__    Number of Pages: __3__
Signer(s) Other Than Named Above: __none__

**Capacity(ies) Claimed by Signer(s)**
Signer's Name: __J. Scott Webber__
☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General
☑ Individual    ☐ Attorney in Fact
☐ Trustee    ☐ Guardian or Conservator
☐ Other: _____
Signer is Representing: __+Victim__

Signer's Name: _____
☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General
☐ Individual    ☐ Attorney in Fact
☐ Trustee    ☐ Guardian or Conservator
☐ Other: _____
Signer is Representing: _____

©2018 National Notary Association

# EXHIBIT C

Randy -

1. I have no records, emails, text messages, social media, investorshub or otherwise to any public companies on this list.

2. I was the acting CEO of Bell Buckle Holding "BLLB" for a period of less than 1 year. I tried to establish my import/export business in the Public Sector which was a ~~failed~~ failed attempt. I resigned shortly after and gave control to Ron Hughes (exhibit "8k")

3. I own a convertible debt of Medx Holdings "MEDH" that I bought third party from Chad Curtis at Uptick for $7,250.00

(Provide 7 pages of Notes)